S. A. ECKERSON, Appellant, v. CITY OF DES MOINES ET AL., Appellees; A. M. HUSTON ET AL., Interveners, Appellants.

Constitutional law: GUARANTY OF REPUBLICAN FORM OF GOVERNMENT: APPLICATION OF CONSTITUTIONAL PROVISION. The provision of the
1 United States Constitution guaranteeing to each State a republican form of government has application only to the form of State government, and not to a system of local government provided by the States for their municipalities or other subdivisions; and chapter 48, Acts 32d General Assembly, providing for the government of certain municipalities is not in violation

of such provision, in that it ignores the essential features of a republican form of government by committing the executive, legislative and judicial departments to a single board or governing body.

**Constitutional law:** MUNICIPAL GOVERNMENT: DISTRIBUTION OF POWER. Article 3, section 1 of the Constitution of Iowa providing that the government of the State shall be divided into three departments, legislative, executive and judicial, and that persons charged with the duty of exercising powers belonging to one department shall not exercise those pertaining to either of the others, has application only to the State government and not to that of municipalities; and the legislature has power to determine the manner in which municipal governments shall be administered, to designate the officers or agencies upon whom the duty shall rest and invest them with power to carry the government into operation; so that chapter 48, Acts 32d General Assembly, is not repugnant to said constitutional provision because investing a mayor and four councilmen, in certain cities, with legislative, executive and judicial powers.

**Same:** LOCAL AND SPECIAL LAWS. The purpose and intent of section 30, article 3 of the State Constitution is to prohibit individual corporate organization of cities, which is local as to place and special as to powers granted; and not the passage of laws applicable to a class of municipalities similarly conditioned, whether then existing or thereafter to come into existence. So that chapter 48, Acts 32d General Assembly, giving to cities of a certain population a special form of government is not repugnant to this provision of the constitution because local or special.

**Same:** UNIFORMITY OF LAWS: CLASSIFICATION OF CITIES. A legislative act providing a special form of government for cities of 25,000 population or over is not unconstitutional, because making an arbitrary classification which is unreasonable, and not based upon any distinction arising out of known fact conditions.

**Same:** PRESUMPTION AS TO LEGALITY OF LEGISLATIVE ACTS. The question of whether conditions exist calling for classification of cities and an exclusive grant of powers is to be determined, in the first instance, by the legislature; and in so doing it will be presumed that such conditions existed, whether specified in the act or not, and that the legislature acted advisedly and within its constitutional rights, unless the contrary appears from the law itself or extrinsic circumstances respecting its operation.

**Same:** GENERAL LAWS: UNIFORMITY OF OPERATION. The fact that it

is possible, or even probable, that some one or more cities may not avail themselves of the provisions of an act granting special powers to the class of cities to which they belong, will not affect the uniform application of the law if all who do accept it are to be governed alike.

Same: DELEGATION OF LEGISLATIVE POWER. A law which is a complete enactment when it leaves the legislative department is not objectionable as a delegation of the legislative power, because containing a provision that it shall not beome operative except upon a vote of the people to whom it is made applicable.

Same: REMOVAL FROM OFFICE. A person in possession of a public office has no constitutional right thereto even for the full period of his term; and the legislature may provide for his removal from an office of its own creation, by a vote of the people of the municipality from which he was elected.

SAME: "INITIATIVE" AND "REFERENDUM." The legislature may provide that a popular vote may be resorted to in the enactment of municipal law; the provisions of the constitution vesting all legislative authority in the General Assembly having no application to the legislative power of city councils.

Same: RIGHTS OF SUFFRAGE: NOMINATION: BALLOTS. Chapter 48, Acts 32d General Assembly, which prescribes a form of government for certain cities, and provides that in preparing the primary ballot for the nomination of officers no names shall be placed thereon except those of persons who have filed a statement of candidacy, etc., does not intend thereby to abridge the right of voting for persons other than those named on the ballot, by inserting their names in writing, and hence is not repugnant to the constitutional provision guaranteeing the unrestricted right to vote for any person or to be a candidate for any office.

Municipal organization: ELECTION: SUBMISSION OF SEPARATE QUESTION. The validity of a special election, to organize a city government under the provisions of chapter 48 of Acts 32d General Assembly, is not affected by the fact that another and distinct proposition was also submitted at the same election.

Construction of statutes: PARK BOARDS. Statutory repeals by implication are not favored; and statutes in apparent conflict will be construed so as to give effect to each if reasonably possible, especially when enacted by the same legislature. Under these rules chapters 42 and 48, so far as they relate to park boards, are both held to be existing law; one relating to park boards in

cities generally, and the other to such boards in cities organized under chapter 48.

*Appeal from Polk District Court.*— HON. JAMES A. HOWE, Judge.

TUESDAY, FEBRUARY, 18, 1908.

ACTION in equity for an injunctional decree.   A. M. Huston and the board of park commissioners of the city of Des Moines intervened, and filed petitions respectively.   The petitions of plaintiffs and the several petitions of the interveners were held bad on demurrer, and from the ruling entered, plaintiffs and interveners appeal.— *Affirmed.*

*Samson & Dillon,* for appellant S. A. Eckerson.

*Carr, Hewitt, Parker & Wright,* for appellant A. M. Huston.

*W. L. Read,* for appellants board of park commissioners.

*W. H. Bremner, I. M. Earle, M. H. Cohen,* and *W. M. McLaughlin,* for appellees.

BISHOP, J.— The defendant city of Des Moines is a city of the first class, organized under the general statute, and having a population of over forty thousand.   The other defendants are the mayor, treasurer, and members of the city council of said city.   The plaintiffs and the intervener Huston are residents, citizens, and taxpayers of said city, and the intervener board of park commissioners of the city of Des Moines is a body existing adjunct to said city in virtue of the provisions of chapter 9, title 5, of the Code.   This action grows out of an attempt on the part of the defendant city to advantage itself of the provisions of chapter 48, Acts Thirty-second General Assembly, entitled " An act to pro-

vide for the government of certain cities, and the adoption thereof by special election. 'Additional to title five of the Code.'" As the questions in the case are addressed in the main to the validity of said act on constitutional grounds, we shall set the same out with sufficient fullness to make clear the field of controversy.     By section 1 of the act it is provided that " any city of the first class, or with special charter, now or hereafter having a population of twenty-five thousand or over,  .  .  .  may become organized as a city under the provisions of this act by proceeding as hereinafter provided." Section 2 provides that upon petition of electors equal in number to twenty-five per centum of the votes cast for mayor at the last preceding city election, the mayor " shall, by proclamation, submit the question of organizing as a city under this act at a special election to be held at a time therein specified."     If the majority of the votes cast shall be in favor thereof, the city shall thereupon proceed to the election of a mayor and four councilmen.     Section 3 provides that all laws governing cities of the first class, and not inconsistent with the provisions of this act, shall apply to and govern cities organized under this act.     Further, all by-laws, ordinances, and resolutions lawfully passed and in force in such city under its former organization shall remain in force; the territorial limits of the city shall remain the same, " and all rights and property of every description which were vested in any such city under its former organization, shall vest in the same under the organization herein contemplated, and no right or liability either in favor of or against it, existing at the time, and no suit or prosecution of any kind shall be affected by such change, unless otherwise provided for in this act." Section 4 provides for the election of a mayor and four councilmen, to be nominated and elected at large, and for the terms of their office and of the officers authorized by the act to be appointed.     Section 5 provides for the nomination of candidates for mayor and councilmen at a primary election.     In brief, the provisions are that any person desiring

to be a candidate shall file with the clerk a statement of his candidacy, and a request that his name be placed on the official primary ballot, and such statement shall be accompanied by a petition signed by at least twenty-five electors. The clerk is required to make up and have printed a primary ballot containing the names in alphabetical order of all candidates who have filed statements and requests.   " And no other names shall be placed on the general ballot."   At the primary election each elector shall vote for one candidate for mayor, and four candidates for councilmen.   " The two candidates receiving the highest number of votes for mayor shall be the candidates, and the only candidates whose names shall be placed upon the ballot for mayor at the  .  .  . election, and the eight candidates receiving the highest number of votes for councilmen shall be the candidates whose names shall be placed upon the ballot for councilmen at such municipal election."

By section 6 it is provided that every such city shall be governed by the council consisting of the mayor and four councilmen, each of whom shall have the right to vote on all questions; fixes the number necessary to a quorum; provides that the mayor shall preside at all meetings, but shall have no power to veto.   Section 7 is as follows:   " The council shall have and possess and the council and its members shall exercise all executive, legislative and judicial powers and duties now had, possessed and exercised by the mayor, city council, board of public works, park commissioners, board of police and fire commissioners, board of waterworks trustees, board of library trustees, solicitor, assessor, treasurer, auditor, city engineer, and other executive and administrative officers in cities of the first class and cities acting under special charter.   The executive and administrative powers, authority and duties in such cities shall be distributed into and among five departments, as follows:   1. Department of public affairs.   2. Department of accounts and finances.   3. Department of public safety.   4. Depart-

ment of streets and public improvements.   5. Department
of parks and public property.   The council shall determine
the powers and duties to be performed by, and assign them to
the appropriate department; shall prescribe the powers and
duties of officers and employés;   .   .   .·  and may make
such other rules and regulations as may be necessary or
proper for the efficient and economical conduct of the business
of the city."·  By section 8 it is provided that the mayor
shall be superintendent of the department of public works,
and to each of the other departments a councilman shall be
elected by the council as superintendent.   The council shall
also elect a city clerk, solicitor, assessor, treasurer, auditor,
engineer, marshal, chief of fire department, street commis-
sioner, three library trustees, and such other officers and
assistants as shall be provided for by ordinance and necessary
to the proper and efficient conduct of the affairs of the city.·
In cities not having a superior court, a police judge shall also
be appointed.   By section 18 of the act it is provided that
the holder of any elective office may be removed at any time
by the electorate of the city, and the method of procedure
which shall be by election based on petition is provided for.
At such election the officer sought to be removed may be a
candidate.   The method of removal thus provided for is de-
clared to be cumulative and additional to the methods other-
wise provided for by law.   By section 19 it is provided that
any proposed ordinance may be submitted to the council by
petition.   If the petition be signed by the number of electors
specified, and contains a request therefor, the council shall
either (a) pass the ordinance within twenty days, or (b) the
council shall submit the same to a vote of the electors of the
city.   If voted for by a majority of the electors voting, such
ordinance shall become valid and binding as an ordinance of
the city.   An ordinance so adopted can only be amended or
repealed by a majority vote of the electors.   By section 20
it is provided that no ordinance passed by the council — ex-
cept such as are required by the general laws of the state, or

in specified cases of emergency — shall go into effect before ten days from the time of its final passage; and if, during said ten days, the passage of the ordinance shall be protested by twenty-five per cent. of the electors the ordinance shall be suspended from going into operation, and it shall be the duty of the council to reconsider such ordinance, and, if not repealed, to submit the same to a vote of the electors. By section 21 it is provided that after any city shall have operated under the act for six years, on petition, the question of abandoning the organization shall be submitted to a vote of the electors, and if carried by a majority vote the city shall resume operations under the general law of the state then applicable to cities of its population.

It is to be observed that the system of municipal government thus sought to be authorized differs radically in many respects from the general system provided for by title 5 of the Code. However, as the act does not contemplate any change in the functions of municipal government, but concerns only the instrumentalities through which such functions are to be exercised, and the form and manner of exercise, and as the right of the Legislature in general to dictate changes in such respect is not challenged, we are not required to enter into detail respecting such points of difference.

Plaintiffs allege that in April, 1907, a petition in form as required, and signed by the requisite number of resident voters, was presented to the mayor of the defendant city, requesting that the question of organizing the city under said act of the Thirty-Second General Assembly be submitted to an election. That, pursuant thereto, a special election was called and held at which a majority of the votes cast were in favor of organizing under said act. The allegation follows that the city and its officers are making preparation to hold a primary and general election for mayor and councilmen as contemplated by said act, and to perfect an organization conforming to the provisions thereof. A decree of injunction is asked because the act of the General Assembly in question —

which we shall hereinafter designate as chapter 48 — is violative of the Constitution of the United States, and of various provisions of the Constitution of this State.     Attention will be called to the particular provisions as we proceed.     It is also alleged in the petition, as ground for the decree asked, that at the special election at which was submitted the question of organizing under chapter 48 there was also submitted and voted upon by the electors a question separate and foreign to the question of organization, by reason of which it is insisted that the election so held was invalid.     And in the petition of intervention of the board of park commissioners it is asserted that the provisions of chapter 48, as far as the same has relation to boards of park commissioners, were repealed by a subsequent act of the Thirty-second General Assembly — being chapter 42, as published — and that in consequence, the provisions of chapter 9, title 5, of the Code, are in full force and effect, and it is demanded that, in the event the prayer of plaintiffs for an injunction be denied, a mandatory injunction issue, directing that the names of candidates for the office of park commissioners for the defendant city be placed upon the official primary and election ballots.     Such were the questions presented by the plaintiffs and interveners in their pleadings filed in the court below, and ruled adversely to them by that court in passing upon the demurrer.     We are not unmindful of the importance of the questions thus presented, and in our consideration thereof we have been at utmost pains to the end that a correct result might be reached.     And, in this connection, it is but fair to say that we have been greatly aided in our labors by the exhaustive arguments presented by the respective counsel appearing in the case; also, by the carefully prepared and well-reasoned opinion handed down by the learned trial judge at the time of ruling upon the demurrers, a copy of which has been laid before us by counsel representing the defendant city.

I.     Taking up the matters of contention in the order

which seems to us best adapted to a disposition of the case, we have as the first question, is chapter 48 violative of section, 4, article 4, of the Federal Constitution? The portion of the section invoked reads thus: " The United States shall guarantee to every State in this Union a republican form of government." This guaranty — so runs the contention — is not alone to the State, as such, but extends to the various subdivisions thereof intended to have part in the affair of government. And the argument follows that a form of municipal government which ignores the essential features of executive, legislative, and judicial departments, each of which shall be separate and distinct from the others, and commits the functions of government to a single board or body, is nonrepublican, and hence repugnant to the guaranty. In our view the hypothesis is wholly wrong, and hence the argument is without force. The purpose of the Federal Constitution was to provide a form of government, republican in character, for the States as a united whole. This is manifest from the history of the times, the contemporaneous writings and public addresses, the constitutional debates, and the provisions of the instrument itself as adopted. And whatever may be the form of words employed by the lexicographers — and they are more or less varied — to define what is meant by the expression " a republican form of government," it is clear that it was understood by the fathers to mean a government by the people, through representatives appointed by them to the various departments — executive, legislative, and judicial, as provided — either by direct vote or through some intervening officer or body by them selected and appointed by direct vote for the purpose. Now, at the time the constitution was adopted, as it is well known, there were in existence thirteen States, each thereof supreme as related to its own domestic affairs, and in each of which the government was divided into three departments — executive, legislative, and judicial — and carried on through representatives se-

1. CONSTITUTIONAL LAW: guaranty of republican form of government: application of constitutional provision.

lected from time to time by vote of the people. It is to be noted, however, that the form of local government provided for municipalities and other State subdivisions varied in the different States. In some, pure democracy obtained through the medium of the " town meeting "; in others, boards of selectmen were chosen, etc. That the form of government in vogue in these States was republican was not made the subject of question when the Federal Constitution came to be considered. No one of such States was called upon to amend its plan of government — State or municipal — to bring it into harmony with the plan proposed for the federal government.

Now, having agreed upon a form or plan of general government it became of interest, as we conceive, that there should be maintained in the several States, then and hereafter composing the Union, a form of government constructed along the lines then presently existing, and generally to be in harmony with the federal plan agreed upon. And, to secure this there was included in the constitutional writing the guaranty provision now under consideration. In this view it becomes apparent that the guaranty was intended to be to the States as such; that it was not intended to have any relation to the systems of local government provided by the several States for the regulation of their municipalities or other subdivisions. Says Judge Cooley in his work on Constitutional Limitations, 28: " The purpose of this guaranty was to protect a Union founded upon republican principles against aristocratic and monarchical invasions," that is, to prevent the people of a State from abolishing a republican form of government. And this is the thought of text and essay writers generally. Clearly enough, there is nothing in the language of the guaranty to indicate a purpose on the part of the general government to interfere with those matters of internal or domestic concern within a State which are of interest only to the people thereof — at large, or as

divided into communities. And as the language does not give warrant, the power does not exist.

The powers of the general government are those delegated to it — either in express words, or following by necessary implication from a power expressly delegated. And the voice of authority is one against any deprivation of or interference with the power of each State to regulate its own internal affairs in which it alone has interest. As said in *Claiborne Co. v. Brooks,* 111 U. S. 412 (4 Sup. Ct. 494, 28 L. Ed. 470) : " It is undoubtedly a question of local policy with each State what shall be the extent and character of the power which its various political and municipal organizations shall possess, and the settled decision of its highest courts on this subject will be regarded as authoritative by the courts of the United States, for it is a question that relates to the internal constitution of the body politic of the State." And in direct line is the holding of the California court in the recent case of *In re Pfahler,* (Cal. Sup.), (88 Pac. 270, 11 L. R. A. (N. S.) 1092: " It is apparent . . . the constitutional guaranty was intended to apply only to the form of government for the State at large, and not at all to the local government prescribed by the State for its municipalities and other subdivisions. . . . It is clearly a question of local policy with each State what shall be its various political subdivisions for purposes of internal government, and what shall be the extent and character of the powers of those subdivisions and the manner of their exercise." See, also, the following cases in which the principle is given recognition : *State v. King,* 37 Iowa, 464; *Hopkins v. Duluth,* 81 Minn. 189 (83 N. W. 536) ; *Brown v. Galveston,* 97 Tex. 1 (75 S. W. 488) ; *Kadderly v. Portland,* 44 Or. 118 (74 Pac. 710, 75 Pac. 222) ; *Williams v. Eggleston,* 170 U. S. 304 (18 Sup. Ct. 617, 42 L. Ed. 1047). *Kies v. Lowrey,* 199 U. S. 233 (26 Sup. Ct. 27, 50 L. Ed. 167), is not an authority against the view thus taken as counsel for appellants seem to think.

In that case an act of the Legislature of Michigan was brought before the court for review. The act was one to incorporate the public schools of a village named, and provided among other things that certain designated persons should constitute the trustees of the district until their successors should be elected as provided in the act. The act was challenged as violative of the Federal Constitution, and the court says: " If the Legislature of the State has the power to create and alter school districts . . . the action of the Legislature is compatible with the republican form of government, even if it be admitted that section 4, article 4, of the Constitution, applies to the creation of, or the powers or rights of property of, the subordinate municipalities of the State." The case of *Railroad v. Chicago,* 166 U. S. 226 (17 Sup. Ct. 581, 41 L. Ed. 979), and other like cases cited by counsel, do not, in our view, have any bearing on the question as here made. The doctrine there announced is that, in respect of those private rights of persons and property which are granted to the individual citizens of the country, they can no more be violated by an instrumentality or agency of a State than by the State acting in its sovereign capacity. In other words, what the State is forbidden to do respecting the personal and property rights of its citizens, it cannot create a municipality with power to do.

II. More or less in line with the contention disposed of in the preceding division of this opinion is the further contention of plaintiffs that chapter 48 is void because re-

**2. CONSTITU-TIONAL LAW: municipal government: distribution of power.** pugnant to section 1, article 3, of the Constitution of this State. That section reads as follows: " The powers of the government of Iowa shall be divided into three separate departments: the legislative, the executive and the judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others." It will be observed that by section 7 of chapter 48, the municipal powers — executive,

legislative and judicial — possessed by the cities becoming organized under the act, shall be exercised by the council consisting of the mayor and four councilmen elected as herein provided for.   But little is necessary to be said in making disposition of this contention.   To our minds it seems plain that the Constitution has reference solely to the instrumen-·talities through which the powers of the State — acting directly in its sovereign capacity — shall be exercised.   As applied to the legislative department, the Constitution of the State is a limitation, and not a grant of power.   Hence the courts look not at what the instrument authorizes, but at what is prohibited. *Stewart v. Board,* 30 Iowa, 9. And beyond providing that the organization of cities and towns shall only be brought about through the medium of general laws, and placing certain limitations upon the powers that shall be exercised by municipalities — as, for instance, the power to contract indebtedness — the Constitution is wholly silent on the subject of the means by which, and the manner in which, local self-government shall be accomplished.   From this comes readily the conclusion that there was committed to the General Assembly, as part of the legislative authority vested in it, full and plenary power to select the agencies appropriate in its judgment to the purpose, and to clothe such agencies with powers to be exercised in manner and form as prescribed therefor.   Indeed, this must be so.   Inherent in the unrestricted authority to organize is the authority to prescribe powers within general constitutional limits, and to designate the officials upon whom shall rest the duty of carrying such powers into execution.   Smith on Corporation, 153; Cooley on Constitutional Limitations, 133; 20 Am. & Eng. Ency., 1223. And all the authorities agree that, in the absence of any constitutional restriction, it is within the province of the Legislature to clothe an officer or agency created by it with functions involving the exercise of powers executive, legislative, and judicial in character — one or all. *State v. Bar-*

*ker,* 116 Iowa, 109. So, also, the universal practice has been that way. As it is well known, the county courts of this State, when they existed, were not only authorized to perform judicial duties, but executive and legislative, as well. Under the general statutes now existing, mayors of cities and towns have conferred upon them powers and duties both executive and judicial, and, particularly in towns, the mayor, in virtue of his right to vote on all questions coming before the council, constitutes in all strictness a part of the corporate legislative body. Boards of supervisors, city and town councils, boards of school directors, township trustees, and various individual officers are directly charged with and are in the performance of powers and duties, now, administrative in character, and again judicial, etc. We shall not stop to further particularize. The statute book of this State, as of every State in the Union, is replete with illustrative examples. In support of their position, counsel for plaintiffs rely upon *Attorney General v. Detroit,* 112 Mich. 145 (70 N. W. 450, 37 L. R. A. 211) and *Whitcomb's* case, 120 Mass. 118 (21 Am. Rep. 502). In our opinion the cases thus cited do not reach the question as made on the record before us. As the books in which they are to be found are generally accessible, we shall not stop to discuss them.

III. Section 30, article 3, of the Constitution of this State, provides that the General Assembly shall not pass local or special laws for the incorporation of cities and towns.

3. SAME: local and special laws.

In such cases the laws shall be general, and of uniform operation throughout the State, and by section 6, article 1, it is provided that all laws of a general nature shall have a uniform operation. Plaintiffs and interveners challenge chapter 48 as violative of the provisions thus cited. And this is the matter upon which principal stress is laid in argument. As we understand, the grounds of contention are these: (1) The act is local or special legislation, because the proposed operation thereof is restricted to a limited number of cities — i. e.,

those of the first class and under special charter having a certain population and which elect to adopt the same; (2) the act is not intended to have, nor is it possible that it should have, uniform operation, because (a) the classification adopted is arbitrary and without substantial grounds of distinction in its designation of the cities to be affected; and (b) it is intended to have application only to those cities which accept it on popular vote of the electorate. The questions arising out of these matters of contention are somewhat interwoven, and may properly be discussed in the same connection.

In a sense, it is true that according to its terms the act is to have a limited operation. But it is a limitation founded upon inherent conditions, and not upon number. It will be observed that the reading of the act is " any city "; there is no attempt to make individual selection. This being true, there is no force in the contention that the act must be condemned because local or special. Those words as employed in the Constitution are essentially descriptive. While, theoretically, they are not strictly similar in meaning, still when we consider the circumstances of their use, as we are authorized to do, it becomes clear that the framers of the Constitution employed them as equivalents — as descriptive of one and the same thing. Looking for a moment into the history of the times we find that it was a provision of the Constitution of 1846 that the Legislature might pass " special " laws for the creation of political or municipal corporations. And, under this authority, as it is well known, many special charters were granted during the first ten years of the State's existence. An examination of the various acts discloses that in each instance they were both local and special — local as to the territory to be affected, and special as to the powers authorized to be exercised within such territory. And in enumerating the powers to be conferred in each instance the Legislature was altogether unhampered by any established rule of conformity. In the course of time, opposition to the

practice — as pernicious and fruitful of evil — developed, and popular condemnation followed. So it was that, when the constitutional convention met in 1855, the demand was general for a change. This resulted in the rejection of the provision formerly in force, and the incorporation in the new Constitution of the provision on the subject as we now have it.

From this comes readily the conclusion that the practice adjudged to be evil and sought to be prohibited was individual corporate organizations; that is, corporate organization combining local and special features — local as to place, and special as to the particular powers granted. This conclusion is strengthened when we consider that, in each instance where organization had been effected in virtue of the constitutional authority, no more than a single legislative act was resorted to for the purpose. In such act the place was fixed, and the grant of powers made. So, also, on general reasoning we cannot conceive of a local act providing for municipal organization which is not also special. Failing to specialize the place, an act could not in the very nature of things be local. On the other hand, it does not seem that there could be a special act for incorporation without reference made therein in some way, direct or indirect, to the place within the limits of which the act should have force of operation. From all this, we have the ultimate conclusion that the prohibitive ban of the present Constitution is against an incorporation act, the distinctive features of which shall be the selection of a fixed and definite territorial location, and a grant of individualized powers; powers not necessarily different in character from those to be found in other grants, but made up without reference to any other grant. It follows from this that the words " local " and " special " must be accepted as synonymous, in the sense that they are descriptive of one and the same thing. When analyzed, our own cases will be found to rest upon this view. The practice of municipal classification — each class having

granted powers differing in many respects from those en-
joyed by the others — dates back to the organization of the
State.   And this court has uniformly recognized the practice
as within the legislative authority.   The doctrine of all the
cases is that an act is not local or special if it brings all
municipalities similarly conditioned — then existing and
thereafter to come into existence — into a class, and in re-
spect of each of which the act is to have uniform opera-
tion.   And, as involving the same principle, an act is not
local or special which confers upon a class of municipali-
ties — theretofore existing as such, or brought into existence
by the act itself — powers to be exclusively enjoyed.   This
must be so because, if an act creating a class with exclusive
general powers is not open to criticism as a local or special
act, an act granting to the cities of such class additional
powers could not be.   *McAunich v. Railroad,* 20 Iowa, 338;
*Haskel v. Burlington,* 30 Iowa, 232; *Owen v. Sioux City,*
91 Iowa, 190; *Tuttle v. Polk,* 92 Iowa, 433.

In *Owen v. Sioux City* there was brought into question
an act of the Legislature which granted to cities of the first
class, organized since January 1, 1881, certain powers in
respect of street improvements, to levy taxes to pay therefor,
etc.   The act was assailed as special and not of uniform
operation.   The court said:  " That the law in question is
special in its nature does not render it vulnerable to the
constitutional inhibition.   That it is special as to the subject-
matter to which it applies is not to be doubted.   .  .  .
Nothing in the specifications (of the Constitution) is in
any way a prohibition on the legislative authority to legislate
specially with reference to cities of a particular class, nor
as to particular cities of a class, by any form of designation,
hence we may dismiss the claim that the act is of a special
nature as to the subject of legislation so as to render it void."
*Haskel v. Burlington* arose upon an act of the Legislature
granting to all cities under special charter, not theretofore
possessing the right, full power to sell real and personal

property for delinquent taxes. The act was assailed as special, and it was said: " The true construction seems to be that the act in question operates upon a particular condition, and attaches to it certain consequences, and that whenever that condition exists the consequences follow. So that wherever cities are found in whatever portion of the State, be they few or many, which were incorporated under special charters, to them the law applies. And it applies to all cities in the State falling within the class specified, and, hence, is not local or special, but of uniform operation." The act under consideration in *Tuttle v. Polk* was one granting certain powers and privileges to all cities of the first class having a population of thirty thousand or over; thus excluding, it is to be observed, other cities of the first class then existing within the State. The act was assailed as local or special, and in disposing of the contention the court said: " At the time it [the act in question] was enacted the city of Des Moines was the only one in the State having a population as great as the number stated, but that fact did not make the act special, for the reason that it was not restricted to cities having the required population at the date it became a law, but was general, applying to all cities which should thereafter have more than thirty thousand." In *McAunich v. Railroad* the act considered did not have relation to matters municipal in character, but it was said *arguendo* that " very many laws, the constitutionality of which are not doubted, do not operate alike upon all citizens of the State. Take the case of the general laws for the incorporation of cities and towns which is one of the special cases enumerated in section 30, article 3, of the Constitution, in which the laws must be general and of uniform operation. By those laws, certain rights, powers, and privileges are conferred upon cities of the first class, of which there are but three or four in the State; certain other different and less powers and privileges are conferred upon cities of the second class, and still different and less upon towns. These laws are gen-

eral and uniform, not because they operate upon every person in the State, for they do not, but because every person who is brought within the relations and circumstances provided for is affected by the law.   They are general and uniform in their operation upon all persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation."   The cases on the subject arising elsewhere are in more or less of confusion.   An attempt to harmonize them would be a work of supererogation, and we have neither time nor space therefor.   The following cases, gathered from " Words and Phrases," are either directly or on principle in accord with our view respecting the meaning of the words " local " and " special," found in the constitutional provision, as gathered from the circumstances of their use:   Lastro. v. State, 3 Tex. App. 363; Smith v. Grayson, 18 Tex. Civ. App. 153 (44 S. W. 921); Stone v. Wilson, 19 Ky. Law, 126 (39 S. W. 49); Ladd v. Holmes, 40 Or. 167 (66 Pac. 714, 91 Am. St. Rep. 457); State v. Mayor, etc., 52 N. J. Law, 32 (18 Atl. 694, 6 L. R. A. (N. S.) 57); Allen v. Hirsch, 8 Or. 412.   And the following among other cases that might be cited, will be found to be in substantial harmony with our cases in the holding that acts creating or having relation to a created class of municipal organizations, are not for. that reason to be denounced as falling within the constitutional prohibition: State v. Cooley, 56 Minn. 540 (58 N. W. 150); State v. Minor, 79 Minn. 201 (81 N. W. 912); In re Cleveland, 52 N. J. Law, 188 (19 Atl. 17, 7 L. R. A. 431); People v. Hoffman, 116 Ill. 587 (5 N. E. 596, 8 N. E. 788, 56 Am. Rep. 793); Lum v. Mayor, 72 Miss. 950 (18 South. 476); State v. Pond, 93 Mo. 606 (6 S. W. 468); Owen v. Baer, 154 Mo. 434 (55 S. W. 644).

Now, under the act immediately being considered, it will be observed that " any city " may organize, etc.   This is tantamount to saying that the act is intended to have application to every city in the State — now existing, or hereafter

to come into existence — having the qualifications prescribed. Therein is to be found no preference of place as the *situs* of corporate power, and each availing city will find in the provisions of the act, and in the general statutes continuing in force, the measure of its authority, its duty, and obligation. As expressed in *Owen v. Sioux City* this is, in a sense, special legislation. It is special, in that it deals alone with the subject of municipal organization in cities specially conditioned. But every legislative act is special where confined to a particular subject over which jurisdiction extends. In the constitutional sense, however, it is not the subject of the legislation, but the application sought to be made which must determine whether the act is general or special. If, in respect of its intended application, the act particularizes the place — or, for that matter, places — which is made the recipient of corporate authority, it is offensively special. On the other hand, an act is general if the effect thereof on being put into operation is to bring into a class all places similarly conditioned — then existing, or thereafter to come into existence — and in respect of each of which places the provisions of the act are to be equally applicable. We are not, of course, to be understood as saying that an act, general in terms, may not be open to criticism as in fact local or special. It may well be that where the conditions existing are such that it is not possible in point of fact that an act should have operation in more than one city, or a limited number of cities, such act should be given character as special although in terms it purports to be general. Thus, an act which by its terms was to be applicable to all cities which had a population of thirty thousand by the census of 1885 was condemned by this court as local or special legislation, it being made to appear that there was but one such city in the State. *State v. Des Moines,* 96 Iowa, 521. And there are numerous decisions elsewhere to the same effect. But where the conditions are such that classification is possible a law intended to have uniform operation on all cities throughout the State,

then or thereafter coming within the projected lines of class-
ification, must be regarded as a general law.   *Tuttle v. Polk,
supra; State v. Des Moines, supra; Page v. Middlerton,* 114
Iowa, 378.   And, as we have seen, it has not been thought
material by this court, in determining whether an act is
special or general, that at the time of the passage thereof
there was but one city, or a limited number of cities, having
the class qualifications.   If possible for other cities to attain
to such qualifications, and the provision is that on doing so
they shall take their place within the classification provided
for without the aid of further legislation, it is enough to
stamp the act as general in its character.   *Tuttle v. Polk,
supra,* and cases cited; *People v. Kipley,* 171 Ill. 44 (49
N. E. 229, 41 L. R. A. 775).   Considering chapter 48 in
the light of what has been said foregoing, it is not possible to
assign character thereto as a local or special law in any sense
offensive to the Constitution.   Having reached this conclu-
sion, we may turn to the other phase of the contention for
invalidity, and inquire whether the act should be condemned
because lacking in the requirement for uniform operation.

As we have seen the argument here is twofold:   First,
it is insisted that the classification adopted is unreasonable
because arbitrary, and is not based upon any distinction
arising out of known fact conditions fairly
giving warrant thereto; second, uniformity of
operation is not assured in view of the fact
that, according to the provisions of the act, only such cities
coming within the general classification as shall on popular
vote elect to avail themselves of the right to organize are to
be affected.   Addressing ourselves to the first matter of con-
tention, it may be conceded that the class selection is an
arbitrary one, in the sense that there is called into the class
only cities possessing certain fixed qualifications, and all
others are excluded.   But here is not ground for criticism.
Given the power to classify, of necessity every act through
which the power is sought to be exercised must be arbitrary.

In its division of municipal corporations into cities of the first and second class, and incorporated towns, on the basis of population, the general statute is arbitrary. So, in every instance where separation into classes has been attempted. And there is no ground upon which to rest an argument that this is unreasonable. As we have seen, a law intended to have application to a class of municipalities is general, and it is not material that the class to which the law is to have exclusive application is carved out of a class theretofore created and existing. And on no theory, as it seems to us, can it be said that a law by which all corporations falling within the newly created class are to be affected alike must fail for want of uniformity. As said in the *Owens* case:

The cities and towns of the State, when incorporated, are classified as cities of the first and cities of the second class, and incorporated towns, the classification being based on difference in population; and the exercise of corporate powers by each, under legislative authority, is in pursuance of such classification. Hence it seems to be conceded that legislation applicable to these different corporations answers the constitutional requirement as to uniformity of operation. It should be said in this connection that this basis of classification is one based on legislative enactments, and has no express constitutional sanction. The thought is important as bearing on the authority of the Legislature to make other classifications in defining the operation of its enactments. . . . It [the act in question] was made to meet conditions and wants existing or anticipated, of a class of cities, and the date was but the separating point whereby other cities were excluded from the operation of the law. That it makes another classification of cities than those based on population is not fatal to the act, because, as we have said, the classification on the basis of population is by legislative action, and there is nothing prohibiting such further classification as the Legislature may think proper; and the only proper inquiry as to classification in the case at bar is, is the act, because of the classification adopted, without that uniformity of operation contemplated by the Constitution? We think not.

We repeat that the courts of many of the other States have taken a different view of the subject, and counsel have been diligent in collecting and bringing to our attention such cases.   We have examined many of the cases, and we are not persuaded that the rule of our own cases should be abandoned.   Quite to the contrary, we adhere to the thought that as the general subject of the government of the municipalities of the State is committed to the Legislature, that body should be left free to exercise its power unrestrictedly, and to be interfered with only in cases so flagrant in character as to be repugnant in any fair sense to the Constitution.

Coming to the second question, in the situation of this case, it would seem that but little need be said.   Conceding the rule that classification of municipalities by legislative

5. SAME: presumption as to legality of legislative acts.

act — the object being to confer upon a class selected some exclusive power or powers — must be founded upon some appreciable difference in condition, existing or to be apprehended, still it remains to be said that the question whether conditions do exist which reasonably call for the classification and exclusive grant of powers, must be answered, primarily at least, by the lawmaking body.   And it is fundamental doctrine that the courts will not interfere on constitutional grounds unless the act is clearly and palpably within the inhibition of the fundamental law.   *Santo v. State,* 2 Iowa, 165 ; *Richman v. Board,* 77 Iowa, 513; *Ogden v. Saunders,* 12 Wheat. (U. S.) 213 (6 L. Ed. 606).   This is only another way of saying that the Legislature will be presumed in all cases to have acted within its constitutional right unless it affirmatively appears — either from the provisions of the act itself, or from extrinsic facts and circumstances, respecting the proposed operation thereof, known to the court or made manifest on proof — that proper legislative bounds have been exceeded.   Now, it has never been thought fatal to an act that it does not specify on its face the conditions, relations, and circumstances essential to its validity.   Especially as related to acts for the

creation or regulation of corporations purely public in their character, it will be presumed that such necessary conditions, etc., exist in fact or are reasonably to be apprehended. As said in *Owen v. Sioux City, supra:* " We are not aware of any rule whereby an act of the Legislature must specify the conditions on which its validity must depend, but, on the contrary, the court will assume the existence of such conditions until it is apparent that they do not exist." And in *Munn v. Illinois,* 94 U. S. 113 (24 L. Ed. 77), a case in which the constitutionality of an act of the Illinois Legislature was drawn in question, this was said: " For our purposes, we must assume that, if a state of facts could exist which would justify such legislation, it actually did exist when the statute under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void; but if it could, we must presume it did."

Aside from the presumption, however, it is not difficult to reach the conclusion that the lawmaking body, in its survey of the conditions existing in the State, and having regard for future interests, found sufficient upon which to justify action looking to the better government of our larger cities, for whose general welfare it is in large measure responsible. Not only will the lawmaking body be presumed to know that which is commonly known among men, but it will be presumed to have investigated and advised itself respecting the conditions made by it the subject of legislative enactment. Every student of civic affairs knows that the problem involved in the government of our larger cities — here and elsewhere throughout the Union — is one of the chiefest concern, of perplexity, and anxiety. So often does the cry against official corruption and misrule go up from the congested centers of population, that every serious minded citizen whose interests are bound up to any measureable extent with a proper administration of municipal affairs, and whose desire is for a

perpetuation of the institutions planted by the fathers, must pause and consider.   This is not the place for an extended dissertation on the subject of municipal evils, their cause and cure, and we shall not make any attempt in that direction.   We are not required to determine whether the cry is well or ill founded.   Suffice it to say, it is but natural that the legislative ear should have been reached; and, as we have seen, with the legislative body lies the responsibility to investigate and to act in the first instance.   So, also, it is not material that in its selection of a measure looking to the betterment of municipal conditions, or for reform, it shall adopt such as on being put into practice prove ineffectual or inadequate to better conditions.   If the action taken is within general constitutional lines, there is no power in any other department of the government to interfere.   The mistake, if such shall be made in any given instance, must find its correction with the body which made it.   These conclusions are so far based on elementary principles that further citation of authorities in support are not required.

Addressing ourselves to the contention as last made in this connection, we find no semblance of merit.   Assuming, for the present purposes, that it was proper for the Legislature to provide that organization under the act 6. SAME: general laws: uniformity of operation. should not obtain in any particular city falling within the class legislated upon except on popular vote of the electorate — a subject presently to be brought forward for consideration — still it must be said that the act is intended to operate uniformly upon all those cities which do avail themselves thereof, and under the doctrine of our cases cited foregoing this is sufficient.   If all cities availing themselves of the act are to be governed alike, the law is uniform.   And this conclusion is not disturbed because, forsooth, it is possible, or even probable, that some one or more of the eligible cities may not avail themselves of the act.   Further discussion of the point does not seem to us necessary.   Our conclusion finds support in the following

cases: *Dalby v. Wolf,* 14 Iowa, 228; *State v. King,* 37
Iowa, 462; *Lytle v. May,* 49 Iowa, 224; *State v. Forkner,*
94 Iowa, 733; *Adams v. Beloit,* 105 Wis. 963 (81 N. W.
869, 47 L. R. A. 441); *People v. Kipley,* 171 Ill. 44 (49
N. E. 229, 41 L. R. A. 775).

IV. As further violative of section 1, article 3, of the
State Constitution, counsel for plaintiffs assail the act be-
cause of the provision therein that it shall not become ef-
fective as related to any particular city except
on affirmative vote of the electors thereof.
And here it is said to be an attempt to dele-
gate legislative power. We may concede that the lawmaking
body of the State is not authorized to submit to a popular
vote of the State the question whether or not an act proposed
by it shall become a law. This court has so held in a number
of cases. *Santo v. State,* 2 Iowa, 165; *Geebrick v. State,*
5 Iowa, 491; *State v. Weir,* 33 Iowa, 134; *State v. Forkner,*
94 Iowa, 733. But while this is so, it does not follow by
any means that the lawmaking body may not reserve to the
electors of a subdivision of the State — included within the
intended scope of operation of an act designed to have effect
upon local government conditions — the right to determine
on popular vote whether or not they will advantage them-
selves of the act. If an act in question is complete in itself,
and requires nothing further to give it validity as a legislative
act, it is not vulnerable to attack on constitutional grounds
simply because the limits of its operation are made to depend
upon a vote of the people. And such is not only the doctrine
of our own cases, but it accords with the great weight of
authority. *Morford v. Unger,* 8 Iowa, 82; *Dalby v. Wolf,*
14 Iowa, 282; *State v. King,* 37 Iowa, 462; *Lytle v. May,*
49 Iowa, 224; *State v. Forkner,* 94 Iowa, 733; *Des Moines
v. Hillis,* 55 Iowa, 643; *In re Cleveland,* 52 N. J. Law, 188
(19 Atl. 17, 7 L. R. A. 431); *State v. Hoagland,* 51 N. J.
Law, 62 (16 Atl. 166); *Clark v. Rogers,* 81 Ky. 43; *Opinion
of Judges,* 55 Mo. 295; *Insurance Co. v. Swigert,* 104 Ill.

7. SAME: delega-
tion of legisla-
tive power.

653; *Mayor v. Finney,* 54 Ga. 317; *Adams v. Beloit,* 105
Wis. 363 (81 N. W. 869, 47 L. R. A. 441); Dillon on Municipal Corporations, section 44; Cooley on Constitutional
Limitations, sections 143, 230; 15 Cyc. 318.

In *Dalby v. Wolf,* the so-called "Herd law," which
authorized the county judge to submit to the people of his
county the question whether stock shall be permitted to run
at large, was under consideration, and the law was assailed
as one depending for its validity upon a vote of the people.
In writing the opinion Wright, J., says: "The law is not
obnoxious to this objection. The popular will is expressed
under and by virtue of a law that is in force and effect, and
the people neither make nor repeal it. They only determine
whether a certain thing shall be done under the law, and not
whether said law shall take effect. The law had full and
absolute vitality when it passed from the hands of the Legislature, and the people under the 'rule of action' therein
given for their government proceeded to act." And in *State
v. Forkner,* which arose under the so-called "mulct tax laws,"
it is said by Deemer, J., that "the constitutional objection
to the law is met, if the act, when it came from the Legislature, received the Governor's approval, and was properly
published, was, of itself, a complete and perfect enactment."
We need not review the other cases cited. That the act here
in question became a completed act does not seem to us open
to question. It passed through the regular channels of legislative enactment, and it had the approval of the executive.
Moreover, by its terms, the act provided that it should become a law in full force and effect upon its publication, and
publication as by law provided was had. Nothing then
remained but for the cities embraced within the class designated by the act to severally determine whether or not they
would advantage themselves of such act. This being the
situation the act is not open to the criticism here put upon
it.

V.   It will be observed that section 18 of the act em-

bodies what is called the " recall " feature, and, in sections 19 and 20, are what is commonly known as the " initiative " and " referendum " features.  Here, the contention on the part of counsel for plaintiffs — as stated in their brief of points — is that such features of the act are repugnant to section 1, article 3, of the State Constitution, which vests all legislative authority in the General Assembly.   In the main, however, the argument is addressed as to the question of whether or not we have in these an attempted departure from a republican form of government.   On the part of council for defendants, the subject is passed over with scant notice, and this it would seem because of the understanding on their part that if the act shall be given approval in other respects the ruling on the demurrer must be upheld, even though the contention of appellants respecting the particular section now under consideration shall be sustained.   This, of course, on the theory that an act will not necessarily be condemned as a whole, because some separable part is vulnerable to constitutional objection.   And it would seem clear that the sections in question, if void, might be stricken from the act without interfering with the plan of corporate organization as provided for in the remaining sections.   But there is authority for the proposition that even though the provisions of an act are separable, and not dependent one upon the other, the rule that the unconstitutional provision may be discarded and the valid provision allowed to stand applies only where it is plain that the lawmaking body would have enacted the legislation with the void provision eliminated.   It was so said by the Supreme Court of the United States in the recent case of *Howard v. Railroad,* 207 U. S. 463 (28 Sup. Ct. 141, 52 L. Ed. —).   Without stopping for a discussion of the proposition as announcing a rule of construction we may accept of it as correct in principle in making disposition of the present case.   We may well imagine that cases might arise in which much difficulty would be encountered in getting at the temper or state of mind of the legislative

body. But in view of the conclusion reached by us for validity in sections of the act here particularly assailed, we shall have no occasion to enter that field of inquiry. Here, also, it should be remembered that it is for us to deal only with the question of the constitutional power of the Legislature to enact. That question once settled, we must stop. With the policy of the legislation, therefore, we are not concerned. Nor are we called upon to speculate upon or consider the probable or possible results of the legislation.

Giving attention first to the " recall " feature as embodied in section 18 of the act, we find the dominant thought to be that the mayor and the several councilmen shall at all

8. Same: removal from office.

times be subject to removal from office on vote of the electors. And a mode of procedure is provided. Counsel do not cite us to any provision of the Constitution by which the proposed method of unseating a municipal officer before the end of the term for which he was elected is prohibited. And we have failed to discover any such provision. Public offices are created in the interests of the general public, and not for the benefit of any individual. And no one in possession of an office has a constitutional right to remain therein for the full period of the term for which he was elected. *Shaw v. Marshalltown,* 131 Iowa, 128. The incumbent of a State office is subject to a removal on impeachment proceedings. This is a provision of the Constitution. Section 20, article 3. Beyond that, the Constitution is silent. And from this it follows that the general subject of the removal of county, city, etc., officers, was committed to the hands of the Legislature. There are now on the statute book general provisions on the subject, and there can be no reason why others may not be added to these as in the legislative judgment such are called for. Being unlimited in its power, the Legislature may prescribe the conditions on which removal proceedings shall be instituted, and the tribunal or body in which shall

be vested the power of determination. And as no contract right exists in favor of the incumbent of an office, it does not remain for him to quarrel with the method of procedure adopted. In the case of a statutory office, the Legislature may even abolish the office, and with the taking effect of the law providing therefor the right of the incumbent to further act ceases *eo instanti,* notwithstanding the term for which he was elected has not expired. *Crozier v. Lyons,* 72 Iowa, 401.

Coming now to the " initiative " and " referendum " features of the act, it will become fully apparent on a moment's reflection that our field of inquiry is limited in

9. SAME: initiative and referendum.

its scope. As it would seem, the question narrows down to this: Is it without the power of the Legislature to provide that a popular vote may be resorted to in the enactment of municipal ordinances and by-laws? The contention of counsel that a law thus provided would be violative of section 4, article 4, of the federal Constitution, is sufficiently disposed of by what is said in the first division of this opinion. So, also, in disposing of the question, it is clear that we have no need to concern ourselves whether or not the State may under constitutional amendment, and without departing from a republican form of government, provide that in the enactment of general laws the initiative and referendum features shall have place. We may remark, however, that it has been recently decided by a court of great respectability that a provision in a State Constitution providing for the adoption of those features is not opposed to the federal guaranty. *Kadderly v. Portland,* 44 Or. 118 (74 Pac. 710, 75 Pac. 222). The subject of the extent of power in the State to provide for the government of the local subdivisions within its jurisdiction has also been discussed at some length in a former division of this opinion, and we shall avoid repetition as far as possible. As we have seen, the Constitution is silent on the subject, unless, as counsel contends, section 1,

article 3, must be given force to control.   We are unable
to bring ourselves to the view as taken by counsel.   The
contention finds full refutation in the cases already cited
by us, and to such cases may be added the following, which
have direct bearing upon the question of legislative author-
ity as involved in the immediate inquiry:   *Taylor v. McFad-
den,* 84 Iowa, 262; *In re Pfahler* (Cal.) (88 Pac. 270,
11 L. R. A. [N. S.] 1092); *Clarke v. Rochester,* 28 N. Y.
605.

Section 471, Code 1873, conferred upon cities and towns
power to erect or authorize the erection of waterworks on
condition that the voters at a general or special election
approve the same by vote.   The city council of Bloomfield
adopted an ordinance, providing for a waterworks system,
in which ordinance was contained an express declaration
that it should not become effective as an ordinance except
upon vote of the electors.   In the case of *Taylor v. McFad-
den,* cited, the validity of the statute and of this ordinance
was questioned on the ground that the taking effect was made
to depend upon a vote of the people.   And, in support,
the holding in *Santo v. State,* 2 Iowa, 203, and other like
cases were relied upon.   Answering, this court said: " This
ruling [in the Santo case] is based upon the constitutional
provisions vesting the legislative authority of the State in
the General Assembly, and prescribing how laws may be
enacted, approved, and of effect.   These restrictions do not
apply to the legislative authority of the councils of cities
and incorporated towns.   Their powers are conferred by
and limited to those expressed in the charter or statutes
under which the corporation exists and operates."   In the
case of *In re Pfahler,* the court, after a full discussion of
the subject, concluded thus: " That the electors of a duly
organized subdivision of this State may be authorized to
directly participate in the exercise of the legislative power
of such subdivision cannot, we think, be seriously disputed.
There is certainly no provision of our Constitution which

expressly, or by reasonable inference, prohibits it." In *Clarke v. Rochester,* it was said: " But while statutes must be enacted by the Legislature, it is plain the power to make local regulations, having the force of law in limited localities, may be committed to other bodies, representing the people in their local divisions, or to the people of those districts themselves. Our whole system of local government in cities, villages, counties, and towns depends upon that distinction." The following cases have more or less bearing on the subject: *Hopkins v. Duluth,* 81 Minn. 189, (83 N. W. 536); *Hindman v. Boyd,* 42 Wash. 17 (84 Pac. 609); *Ex parte Anderson,* 134 Cal. 69 (66 Pac. 194, 86 Am. St. Rep. 236). The constitutional question cannot, of course, be controlled by the practice which has prevailed in the State. But it is fair argument, as we conceive, to point out that in many legislative enactments — most of which are still in force — the referendum feature has been given application, and generally without question, of constitutional violation. Prominent among these is the provision that the electors in each school district shall at the annual meetings of the districts, determine by popular vote various matters, legislative in character, affecting the interests of the districts. Other instances are familiar to the profession, and we need not search them out. Our consideration of the subject leads to the conclusion that the question made by the contention of counsel should be resolved in favor of the legality of the initiative and referendum features of the act, and we are content to so hold.

VI.   It is a further contention of plaintiffs that section 5 of chapter 48, contravenes section 1, article 2, of the Constitution, which provides that every male citizen, of 10. SAME: right of suffrage. nominations: ballots. the age of twenty-one years, etc., shall be entitled to vote at all elections. And the prefatory argument is that the right to vote at any election carries with it, by necessary implication, the unrestricted right to vote for any candidate of his (the

voter's own choice), and the right to be a candidate for
any office to be voted for.   The contention is predicated
upon the provision of section 5, which requires that, in
preparing the official primary ballot, no other names shall
be placed thereon except the names of those persons who
have filed a statement of candidacy, accompanied by a nom-
inating petition as in the section provided; and the further
provision which requires that, in preparing the official elec-
tion ballot, the candidates successful at the primary shall be
the only candidates whose names shall be placed thereon.
And here the argument is that the voter is unduly restricted
in his right to select the persons for whom he may desire
to vote — both at the primary and the election — and in
his right to be a candidate, and have votes cast for him
counted, although his name is not printed on the official
ballot.   We think the contention is without force.

It is to be observed, to begin with, that nowhere in the
act is it provided in direct terms that in exercising his
right to vote — either at the primary or general election —
the voter shall be restricted to the so-called official ballot.
Respecting the primary ballot, there is placed at the head
of, and included in the form prescribed, a parenthetical
direction to the voter as follows:  " Place a cross in the
square preceding the names of the parties you favor as
candidates for the respective positions."   Respecting the
election ballot, the provision is that such " shall be in the
same general form as for such primary elections, so far as
applicable," etc.   It is fair to conclude, however, that the
intent was to confine the use of ballots to those authorized
to be officially provided.   Such clearly appears to be the
spirit of the act.   And it is not of this restriction that
plaintiffs complain.   Nor could they well do so.   As far
as we have observed, all of the authorities agree that a
voter has no right of complaint simply because he is re-
quired to use a printed form of ballot.   Ground for dispute
has arisen only where there has been an attempt to put

restriction upon his right to make choice of candidates by substituting in writing the name of another person for one appearing on such ballot. On this point, as we shall see, it is not necessary that we commit ourselves, and we are not to be understood as doing so. It may be confessed that the weight of authority is against the right to thus restrict. 15 Cyc. 289, citing *State v. Dillon,* 32 Fla. 545 (14 South. 383, 22 L. R. A. 124); *Cole v. Tucker,* 164 Mass. 486 (41 N. E. 681, 29 L. R. A. 668); *Sanner v. Patton,* 155 Ill. 553 (40 N. E. 290); *Bowers v. Smith,* 111 Mo. 45 (20 S. W. 101, 16 L. R. A. 754, 33 Am. St. Rep. 491); *People v. Shaw,* 133 N. Y. 493 (31 N. E. 512, 16 L. R. A. 606); *Detroit v. Rush,* 82 Mich. 532 ( 46 N. W. 951, 10 L. R. A. 171); *Eaton v. Brown,* 96 Cal. 371 (31 Pac. 250, 17 L. R. A. 697, 31 Am. St. Rep. 225). As reflecting the contrary view, see *Chamberlain v. Wood,* 15 S. D. 216 (88 N. W. 109, 56 L. R. A. 187, 91 Am. St. Rep. 674). See, also, *Com. v. Reeder,* 171 Pa. 505 (33 Atl. 67, 33 L. R. A. 141).

From what has been said it follows that if the act in question puts restriction upon the voter in making choice of the candidates for whom he will vote, or upon the candidates who may properly be voted for, it must be because of the use of the expression " and no other names shall be placed upon the ballot." And the question comes down to one of construction: What meaning was it intended the expression should have? In and of themselves the words do not prohibit the substitution of names of candidates by writing upon the ballot. It is not impossible that in fact such was within the legislative purpose. · If so, however, it would have been easy to have said so in unmistakable language. And on very familiar principles we will not ascribe to the words used by the lawmaking body a meaning which does not in common understanding follow of necessity for the purpose of holding the act in which they occur obnoxious to the Constitution. Moreover, there are grounds for holding that the provision in the act in question was

not intended to restrict the free right of choice of a voter. In getting at the meaning of words used in a statute, we are authorized to consult other statutes in *pari materia*. Going to the general election law, it will be found that in the provision directing the making up of the official ballot, the expression as we find it in the act before us is used: "And the ballot shall contain no other names." That the Legislature did not intend that the expression should have meaning to forbid voting for persons other than those named on the ballot as candidates is made clear by reference to a further provision — now Code, section 1119 — wherein the voter is authorized in express terms to insert in writing the name of any person for whom he desires to vote. In the absence of some controlling feature leading to a contrary conclusion, we are bound to assume that the conceded meaning of an expression found in an earlier statute was the meaning intended when the same expression came to be used in a later statute — the several acts being devoted to the same general subject, and the connection in which the expression was used being identical. And this, particularly, when necessary to avoid holding the later act to be in excess of constitutional right.

VII. By section 2, chapter 48, it is provided that the question of organizing under the act shall be submitted at a special election pursuant to a proclamation by the mayor. 11. MUNICIPAL ORGANIZATION: election: submission of separate question. As we have seen, it is the allegation of the petition that a proclamation was issued calling a special election to be held for the purpose of submitting the proposition to organize the defendant city under the act, and such an election took place. Can the fact that — as further alleged in the petition — another and distinct proposition was submitted to a vote at said election to be given force to invalidate? We think not. The only requirement is for a special election. Nothing is said making it obligatory that such election shall be exclusively devoted to the question of organization. In common knowl-

edge, the submission of two or more matters to be voted
upon at an election, special or general, has been of frequent
occurrence.   And if the right so to do, in the absence of
an express prohibition, has been hitherto disputed, counsel
have failed to make discovery of such fact.   The argument
of counsel is based wholly upon the thought that in likeli-
hood the one proposition submitted may in some way have
lent strength to the other; some voters, though opposed to
organization, may have voted for it to secure votes in favor
of the other proposition.   This is pure assumption, with
nothing upon which to rest but the imagination of counsel.
It is equally likely that some voters may have voted on
a trade basis against organization to secure voters for or
against the other proposition submitted.   But if the fact
assumed were shown to be a verity, there is no system of
logic on which to attach thereto importance to control the
validity of the election.

VIII.   There remains for disposition the question made
by the petition of intervention of the board of park com-
missioners.   It is true that chapter 42, of the Thirty-second

**12. CONSTRUCTION OF STATUTES: park boards.** General Assembly, had approval at a later
date than did chapter 48.   It will be dis-
covered on reading, however, that chapter 42 amounts to a
revision of the Code provisions on the subject of the election
of, and powers conferred upon, boards of commissioners,
which provisions originated with the Twentieth General
Assembly.   The contention, as we have seen, is that by
chapter 42 there was accomplished a repeal of the pro-
visions of chapter 48, in so far as such act had relation
to the subject of park boards.   In this contention we do
not agree.   There are many cities in the State which are
authorized by the general statute to elect park boards, and
chapter 42 was designed to govern where boards either exist
or may come into existence as adjunct to cities acting under
special charter, or incorporated under the general statute.
Chapter 48 had taken out of the operation of the general

statute the matter of the control of the park interests as obtaining in cities organizing under the act. And so far, there was a repeal of the general statute. Now, in terms, chapter 42 assumes to repeal the provisions of the general statute theretofore in force, and the sections repealed are specifically designated. In no way is chapter 48 referred to. If the related provisions in that act were repealed, it must be by implication. Repeals by implication are not favored, and only where we are driven thereto by the necessities of the situation do we hold that a repeal has taken place. *Railroad v. Supervisors,* 67 Iowa, 199; *Lambe v. McCormick,* 116 Iowa, 169. Especially where the two acts supposed to be in conflict were enacted by the same General Assembly, they should be so construed as to give effect to each if that is reasonably possible. *White v. Meadville,* 177 Pa. 643 (35 Atl. 695, 34 L. R. A. 567); *Hawes v. Fleighler,* 87 Minn. 319 (92 N. W. 223); 1 Lewis Statutory Construction, section 268. It is clear to our minds that the intent of the Legislature in enacting chapter 42 was to better provide for the organization and regulation of park boards in cities generally; that such chapter was not addressed to the provisions in chapter 48, or intended to interfere with the plan as contained therein for the control of park interests in cities organized thereunder. The two acts may well stand together; the one for the control of parks in cities embraced within the class provided by chapter 48, and the other for the control of parks in all other cities. And, plainly enough, this was the intention of the Legislature.

Some other points are made in argument, but they are either disposed of by what has already been said, or they do not merit separate discussion. It follows that the ruling on the demurrer was correct, and it is *affirmed.*