STATE ex rel. GEORGE T. SIMPSON v. CITY OF MANKATO
and Others.[1]

May 17, 1912.

Nos. 17,489—(13).

**Constitution — powers of the state legislature.**

The provisions of a state Constitution do not confer any powers upon the legislature, but are mere limitations, and the legislature has all the powers of an absolute sovereign of which it has not been deprived by the Constitution.

**Constitutionality of statute.**

In determining the constitutionality of an act of the legislature, every intendment must be indulged in favor of its validity.

**Constitution — construction of its limitations.**

Constitutional provisions being mere limitations, the question to be considered, in determining whether a particular act of the legislature violates a particular constitutional provision, is not whether the people, in adopting such provision, had in mind the act of the legislature in question, and were attempting to authorize it, but whether, having in mind the possibility of some future attempt on the part of the legislature to enact such an act, they were attempting to frustrate it in advance.

**Same — distribution of powers — municipal government.**

The requirement of Const. art. 4, § 36, that home rule charters must provide for a "mayor or chief magistrate, and a legislative body," does not of itself import such a severance of the several departments of municipal government as to preclude the legislature from authorizing cities and villages to adopt the commission form of government, wherein the mayor is vested with legislative functions and the council is given other than legislative powers.

**Same.**

Const. art. 3, providing that the powers of government shall be divided into executive, legislative, and judicial, etc., does not apply to municipal gov-

[1] Reported in 136 N. W. 264.

[Note] Constitutionality of commission form of government, see note in 35 L.R.A.(N.S.) 802.

ernments; and neither its expressed intent nor its spirit can be read into Const. art. 4, § 36, so as to extend the limitation imposed by the latter on the form of municipal government, and thereby make it co-extensive with the limitation imposed by the former upon the form of state government.

**Act constitutional.**

Laws 1909, c. 170, authorizing cities and villages to adopt the commission form of government, *held* constitutional and valid.

**Mankato city charter.**

The Mankato city charter, which provides and establishes the commission form of government for the said city, is authorized by Laws 1909, c. 170, and does not transcend the constitutional limitations imposed upon the form of municipal government.

As. attorney general of the state, George T. Simpson petitioned this court for a writ of quo warranto, directed to the city of Mankato, Charles T. Taylor, Ben Bangerter, Jr., Lawrence Henline, J. D. Hunniston and Robert Lamm. The respondents made return that they were duly elected and qualified officers of respondent city, duly acting as such officers, and discharging the duties of their respective offices. The reply admitted that respondents performed the duties required of them by the charter described in the petition, but denied they were performed by the sanction, acquiescence or approval of the state of Minnesota, or any of the people thereof. The court granted its writ. Writ quashed and respondents dismissed.

*Lyndon A. Smith,* Attorney General, *Alonzo J. Edgerton,* Assistant Attorney General, *C. L. Benedict* and *Arthur Schaub,* for relator.

*C. O. Bailey,* City Attorney, and *Lorin Cray,* for respondents.

PHILIP E. BROWN, J.

This is a proceeding in the nature of quo warranto, on the relation of the attorney general, for the. purpose of determining the constitutionality of the charter of the city of Mankato and the right of the other respondents to hold office thereunder. The admitted facts are as follows:

The city of Mankato has, for many years, been a municipal corpo-

ration of this state. In January, 1909, the district court of Blue Earth county duly appointed freeholders to frame a charter for the said city, pursuant to section 36 of article 4 of the Constitution, and under sections 748–758, R. L. 1905, and chapter 170, p. 181, Laws 1909. On April 26, 1910, a proposed charter, framed by the said freeholders, was duly submitted to and adopted by the electors of the said city. In April, 1911, an election was held under such charter, and the respondent Taylor was elected mayor and the other individual respondents were elected councilmen, and each of them has since discharged the duties of such offices. The said charter provides, among other things:

"Sec. 4. Elective officers of the city shall be a mayor and four councilmen."

"Sec. 36. The mayor shall be the chief magistrate and executive officer of the city. He shall see that the laws of the state, the provisions of this charter, and the ordinances of the city are duly observed and enforced within the city. He shall be charged with the general oversight of the several departments of the municipal government and shall see that all contracts made with the city are faithfully performed."

"Sec. 41. The mayor shall be a member of the council, and have a right to vote upon all propositions, matters, and questions coming before it, but shall have no veto power."

"Sec. 43. The administrative powers, authority, and duties of the city officers, not otherwise provided for, shall be distributed among and assigned to five departments as follows:

1. Department of public health, sanitation, police and general welfare.

2. Department of accounts and finances.

3. Department of parks, public grounds, buildings and fire protection.

4. Department of water works and sewers.

5. Department of streets and alleys."

"Sec. 45. The mayor shall be superintendent of the department

of public health, sanitation, police and general welfare, and the council shall, at the first regular meeting after the election of its members, designate by majority vote one councilman to be superintendent of accounts and finances; one to be superintendent of the department of parks, public grounds, buildings and fire protection; one to be superintendent of the department of waterworks and sewers; and one to be superintendent of the department of streets and alleys."

"Sec. 54. The council shall be the governing body of the municipality. It shall exercise the corporate power of the city, and, subject to the limitations of this charter, shall be vested with all powers of legislation in municipal affairs, adequate to a complete system of local government, consistent with the Constitution of the state."

"Sec. 96. After the acceptance by the council of any bid, it shall direct the execution of a contract by the proper officers, in accordance with the said plans and specifications and such contract shall be carried out by the proper department or officer of the city, as in this charter provided."

"In case the council shall determine that any commodities or service are to be procured in open market, the same shall be procured by the proper department or officer in accordance with such general directions as the council may give."

The relator contends that this charter does not comply with the provisions of section 36, article 4, of the state Constitution, and is void: (1) Because "the mayor, being the chief executive of the city, is made a member of the council, and is permitted to participate in all the legislative and other powers given to the council;" (2) because "the council, being the only legislative body provided for in said charter, contains also the mayor, the chief and only executive of the city provided thereby;" (3) because "the council of five members is given legislative, executive, and administrative duties and functions;" (4) because "the council is given other than purely legislative powers."

Section 36 of article 4 of the Constitution, above referred to, empowers cities and villages to frame charters for their own govern-

ment "consistent with and subject to the laws of this state," and provides that "it shall be a feature of all such charters that there shall be provided, among other things, for a mayor or chief magistrate, and a legislative body of either one or two houses; if of two houses, at least one of them shall be elected by general vote of the electors." It further provides for the submission of such charter to the electors for ratification, and that before any city shall incorporate thereunder the legislature shall prescribe by law the general limits within which such charter shall be framed, but that such charter shall always be "in harmony with and subject to the Constitution and laws of the state." And finally it provides that "the legislature may provide general laws relating to affairs of cities * * * which * * * shall be paramount while in force to the provisions relating to the same matter included in the local charter herein provided for."

Sections 748–758, R. L. 1905, provide the method of framing such charters by a board of freeholders and for their submission to the electors, and by Laws 1909, p. 181, c. 170, such board, when so appointed, are authorized and empowered, in addition to other powers theretofore granted them, to incorporate as a part of the proposed charter for any city the commission form of city government. By sections 3 and 4 [p. 182] of the last-mentioned act it is provided that the board of freeholders may distribute the administrative powers, and may prescribe the duties of the officers and incorporate in such charter provisions defining the powers and duties of the mayor and each member of the council, and may provide that each member of the council shall perform such administrative duties as may be designated in such charter.

Upon these constitutional and statutory provisions the relator predicates his contention that the said charter is invalid. As reiterated by him, his contention is as follows: "Our contention is that by the words 'mayor or chief magistrate' is meant an official clothed with executive power, and executive power only, and that therefore a charter which clothes this official with both executive and legislative powers, and makes him a member of the legislative

body, is not in accordance with the constitutional amendment cited. We also contend that by the words 'a legislative body of either one or two houses' is meant a body of officials who are endowed with legislative powers, and legislative powers only, and that therefore a charter which gives to such body both executive and legislative powers, and includes in its membership the chief executive of the city, is not in accordance with the provisions of the amendment. This, briefly stated, is our position, and the one question before this court for determination."

The relator has cited many authorities to support the proposition, propounded by Chief Justice Start in Cooke v. Iverson, 108 Minn. 388, 397, 122 N. W. 251, 254, that, "when the language of the Constitution is positive and free from all ambiguity, courts are not at liberty, by a resort to the refinements of legal learning, to restrict its obvious meaning." That this is the true canon of construction in applying constitutional provisions, cannot be doubted. We again declare, as was declared by the Chief Justice in Cooke v. Iverson, supra, that "we must accept the Constitution as it reads when its language is unambiguous, for it is the mandate of the sovereign power." But from this canon of constitutional construction we cannot slip so readily into the position into which the relator, seemingly unmindful of another great canon of the law, has slipped, and declare that, because of the constitutional requirement that the so-called home rule charters must provide for a "mayor or chief magistrate and a legislative body," the legislature, whose will, except as restricted by the Constitution, is equally the will of the people, may not authorize the freeholders of a city to invest their mayor or chief magistrate with power to participate in the deliberations of the local legislative body, and to give the latter the power to participate in the administrative functions of the city.

We must not forget that the voice of the legislature is the voice of the sovereign people, and that, subject only to such limitations as the people have seen fit to incorporate in their Constitution, the legislature is vested with the sovereign power of the people themselves. In other words, the provisions of a state Constitution do not

and cannot confer upon the legislature any powers whatever, but are mere limitations in the strict sense of that term, and the legislature has all the powers of an absolute sovereign of which it has not been divested by the Constitution. State v. Corbett, 57 Minn. 345, 59 N. W. 317, 24 L.R.A. 498. See also 8 Cyc. 774, et seq.; Nitka v. Western Union, 149 Wis. 106, 135 N. W. 492; Eckerson v. City, 137 Iowa, 452, 115 N. W. 177; Attorney General v. Preston, 56 Mich. 177, 22 N. W. 261. In determining, therefore, the constitutionality of an act of the legislature, the canon of constitutional construction above recited must be applied, together with that other equally as sacred canon that every intendment must be indulged in favor of the constitutionality of an act of the legislature. State v. Corbett, supra; 3 Dunnell, Minn. Digest, § 8931.

"Furthermore," said Mitchell, J., in State v. Corbett, supra, at page 349, [59 N. W. 318, 24 L.R.A. 498], "courts are not at liberty to declare a statute unconstitutional because, in their opinion, it is opposed to the fundamental principles of republican government, unless those principles are placed beyond legislative encroachment by the Constitution, or because it is opposed to a spirit supposed to pervade the Constitution, but not expressed in words, or because it is thought to be unjust or oppressive, or to violate some natural, social, or political rights of the citizen, unless it can be shown that such injustice is prohibited or such rights are protected by the Constitution. Except where the Constitution has imposed limitations upon the legislative power, it must be considered as practically absolute; and to warrant the judiciary in declaring a statute invalid they must be able to point out some constitutional limitation which the act clearly transcends." See also 3 Dunnell, Minn. Digest, § 8932.

The first and main question, then, for determination in this case, is, not whether the Constitution authorized the law of 1909, but whether such act contravenes any provision thereof. Assuming for the moment that such act authorizes the Mankato charter, does it transcend the constitutional requirement that such a charter must provide for a "mayor or chief magistrate, and a legislative body?" and is the said charter "in harmony with and subject to the Consti-

tution?" Obviously, this involves the determination of the meaning of the terms "mayor or chief magistrate" and "legislative body." The relator first contends that the obvious meaning of these terms excludes the conception of any participation by one of the departments thus indicated in the functions of the other, and in support of this contention urges that this exclusive meaning of the terms must be held to have been contemplated when the said requirement was inserted in the Constitution, for the reason that such was the common acceptation of such terms at that time. To this contention and argument there are two replies which, to us, seem conclusive:

First, the question is, not whether the people, in adopting this provision, had in mind any such city charter provisions as those now under consideration and were endeavoring to make anticipatory provision therefor, but whether, having in mind the possibility of some future attempt thus to intermingle the functions of the executive and the legislative departments of municipal government, they were attempting in advance to frustrate any such attempt.

"Constitutions are not made for existing conditions only," said Mr. Justice Brown in Elwell v. Comstock, 99 Minn. 261, 265, 109 N. W. 698, 699, 7 L.R.A.(N.S.) 621, 9 An. Cas. 270, "nor in the view that the state of society will not advance or improve, but for future emergencies and conditions, and their terms and provisions are constantly expanded and enlarged by construction to meet the advancing and improving affairs of men."

Unless, therefore, it can be said that the constitutional limitation now under consideration was intended to exclude the mayor or chief magistrate of a home rule city or village from the deliberations of the legislative body thereof, and to prohibit the latter from exercising executive and administrative functions, the relator's contention cannot prevail, at least so far as it is based upon the obvious and unambiguous meaning of the terms used. We do not think that by the use of these terms such an intention is indicated with that clearness and particularity necessary to vitiate a solemn enactment of the legislature; for under the doctrine laid down by Brown, J., supra, the legislature, unless plainly restricted by the Constitution, had the

117 M.—30.

right to place upon such terms an interpretation that "would meet the advancing and improving affairs of men."

Second, contrary to the relator's contention, and as pointed out in the respondents' brief, the legislature of this state, in granting charters to cities and villages from the time of the admission of the state in 1858 up to the year 1893, when the constitutional provision prohibiting special legislation was adopted, in many instances made the mayor or president of a city or village a member of the council or at least permitted him to vote in case of a tie; and even now under R. L. 1905, §§ 711–728, a village president is a member of the council, and he and the village trustees are constituted peace officers, and are given power to enact ordinances, etc. How, then, can it be said that the Constitution, in requiring that a city shall have a mayor or chief magistrate, plainly contemplates that such officer shall have executive powers only?

The relator contends that this argument does not extend to the matter of giving the legislative body administrative powers, asserting that none of the charters above referred to vest the council with any such powers. But this contention goes more to the weight of the analogy than to its pertinency, and when it appears that the term "mayor or chief magistrate," as used in the Constitution, did not, at the time of its insertion therein, necessarily import an officer vested with executive functions only, it is futile to urge that anyway the term "legislative body" was used in a technically exclusive sense; for the intention of the constitutional limitation to keep the several departments of municipal government separate and distinct, if such were the intention attempted to be expressed, would be as truly, though perhaps not as largely, violated by giving the mayor legislative powers as by also giving the council administrative powers. It is, furthermore, a matter of common knowledge that, when used in connection with municipal government, such terms as mayor, council, etc., are not used in their strictly technical sense as designating officers of exclusively executive and legislative functions respectively. See Eckerson v. City, 137 Iowa, 452, 115 N. W. 177; People v. Harshaw, 60 Mich. 200, 26 N. W. 879, 1 Am. St. 498.

In the latter case Campbell, C. J., delivering the opinion of the court says: "There can be no doubt that under the section in question the mayor is a member of the common council. City charters here, as in England, do not always agree as to the constituents of this body. In some cases there is a separate council, which is only one of the parts of the city legislature, and requiring the approval of another board, or of the mayor, acting separately, as the Governor does, to complete their action. But most of our cities in their earlier stages, if not permanently, have had a council where the mayor sits in person, and over whose action he has no veto. And in all such corporations he has been deemed a member as clearly as the alderman."

See also the cases cited herein in connection with the relator's next contention.

Since, therefore, it cannot be said that the terms used in the constitutional provision under consideration, either of themselves or when construed in the light of conditions prevailing when they were inserted in the Constitution, precluded the legislature from authorizing the provisions of the Mankato charter here attacked, we must seek some other reason, if any there be, why the said act of 1909 and the said charter are invalid. This reason the relator claims to find in article 3 of the Constitution—that "the powers of the government shall be divided into three distinct departments, the legislative, executive, and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except in the instances expressly provided in this Constitution." Upon this provision the relator based his principal argument; for, though explaining, in his reply brief, that he does not contend that this provision is directly applicable to municipal government, he nevertheless attempts to impress this provision upon such governments, if not directly, then through the medium of the said article 4, § 36.

We do not think that the relator's contentions here are well founded. Article 3 does not apply to municipal governments, and we do not see how it can be invoked for the purpose of explaining and

thus extending the limitations imposed by article 4, § 36. In People v. Provines, 34 Cal. 520, a constitutional provision almost identical, even to the wording, with the one here invoked, was held to refer to the state government, as distinguished from municipal governments; Sanderson, J., in speaking of the reasons why the framers of the various American Constitutions adopted provisions of this character, saying at page 537: "The mischief, however, against which they sought to provide, did not come from inferior or subordinate officers, but from the higher grades, in whose hands the first and leading powers of the government were vested. So far as the former were concerned, they were sufficiently under the control of the latter. Abuse of power could not come from the former in such measure as to destroy or overthrow the liberties of the people, except by the direction or connivance of the latter. To surround the latter with checks was a sufficient protection against the former. Hence the framers of American Constitutions were content with checks upon the latter, leaving the former, as we consider, to be regulated by the legislative department."

In Santo v. State, 2 Iowa, ·165, 220, 63 Am. Dec. 487, followed and approved in People v. Provines, supra, it was held that the same person could hold the offices of mayor and justice of peace; the court's reasoning being as follows: "The objection intended is, that the mayor is an executive officer, and that judicial authority is conferred upon him, in conflict with that provision of the Constitution which says that no person charged with the exercise of powers properly belonging to one of these departments—the executive, the legislative, or the judicial—shall exercise any functions appertaining to either of the others. These 'departments' are the departments of the government of the state of Iowa. The mayor of the city of Keokuk is not a part of the government of Iowa. He exercises none of the functions belonging to that department. Whatever executive offices he may perform pertain to him only as an officer of that corporation. But we do not mean to say that he is an executive officer in any proper sense. Similar provisions exist in the Constitutions of all, or nearly all, the other states, and yet from

time immemorial similar powers have been conferred upon mayors of cities."

In Eckerson v. City, 137 Iowa, 452, 115 N. W. 177, a charter vesting all executive, legislative, and judicial powers in a council consisting of the mayor and four councilmen was upheld; the court expressly indicating that the objections urged were not worthy of extended consideration. In Bryan v. Voss, 143 Ky. 422, 136 S. W. 884, a charter provision similar to the Des Moines charter, attacked in the case last cited, was sustained as against a similar objection; Hobson, J., in delivering the opinion of the court, saying: "Under the city charters now in force, the city councils in cities of the second class exercise both legislative and executive functions, and this is true in a large per cent of the municipalities in the state, and has been so from the formation of the government. The Constitution vests the judicial power of the state in certain officers, and no others may exercise these powers. But it has not been the policy of the state to separate legislative from executive functions in its government of the municipalities. The city councils from time immemorial have had charge of the fiscal matters of the municipality, and they have at the same time exercised certain limited legislative functions." In State v. Ure, 91 Neb. —, 135 N. W. 224, a similar conclusion is reached with regard to a similar charter.

We think, therefore, that it is entirely clear that article 3 of the Constitution of Minnesota does not apply to municipal governments, and that neither its expressed intent nor spirit can be read into article 4, § 36, so as to extend the limitation thereby imposed upon the form of municipal government, and thereby make it coextensive with the limitation imposed by article 3 upon the form of state government. We hold, further, that the act of 1909 does not transcend the limitations imposed by article 4, § 36. It is our opinion that this provision merely prescribes the general frame for a home rule charter, and hence that it was competent for the legislature to leave to the freeholders' charter commission the matter of determining the details of the local government, within certain general limits, and, further, that the latter do not preclude such a distribution of the functions of the local government as is made by the Mankato charter.

It may be well to note here, before leaving this brancn of the case, that article 4, § 36, reserves to the legislature full control over home rule charters. The language, as recited above, is: "The legislature may provide general laws relating to affairs of cities  *  *  * which  *  *  * shall be paramount while in force to the provisions relating to the same matter included in the local charter herein provided for." Does this not argue for a liberal construction of the other provisions of this section, and is it not enough to quiet the fears of those who may in spectral vision look upon the provisions of the Mankato charter as too radical a departure from the tradi-. tional form of municipal government? For if the municipalities, given this large measure of freedom, should go astray, has not this provision reserved to the legislature the power to reach out and bring them back into the path of institutional righteousness?

The only remaining question necessary to be determined in this case is whether the act of 1909 authorizes the Mankato charter, and we think it does. It is a broad grant of power to fix, within certain general limits, all the details of the local government. It furthermore expressly provides that the board of freeholders may distribute the administrative powers, and prescribe the duties of the officers, and may incorporate in the charter provisions defining the duties and powers of the mayor and each member of the council, and may provide that each member of the council shall perform such administrative duties as may be designated in such charter. The foregoing is, we think, precisely what has been done in the Mankato charter. Charters very similar to this one have been sustained in other states having Constitutions and laws very similar to ours. See Eckerson v. City, 137 Iowa, 452, 115 N. W. 177; Bryan v. Voss, 143 Ky. 422, 136 S. W. 884; Cole v. Dorr, 80 Kan. 251, 101 Pac. 1016, 22 L.R.A.(N.S.) 534. Furthermore, in State v. Ure, supra, it was held· that such a charter, adopted pursuant to legislative authority, was valid, absolutely without any constitutional authorization whatever.

Writ quashed, and respondents dismissed.