ARTHUR LEIGHTON v. MRS. CLEON N. ABELL
AND OTHERS.[1]

March 15, 1948.

Nos. 34,691, 34,692.

---

[1]Reported in 31 N. W. (2d) 646.

*Child & Child,* for plaintiff appellant.

*John F. Bonner,* City Attorney, and *Carsten L. Jacobson* and *Robert W. Barnett,* Assistant City Attorneys, for appellants Stanley Anderson and others as members of the Minneapolis city council and Charles C. Swanson as city clerk.

*Charles B. Howard, Thomas Tallakson, James D. Bain, Elmer R. Anderson,* and *Josiah E. Brill,* for Mrs. Cleon N. Abell and others as members of the Minneapolis Charter Commission, respondents.

LORING, CHIEF JUSTICE.

There are before us two appeals from the same judgment. The case below was tried before the court on a complaint seeking judgment declaring M. S. A. 410.23, 410.24, 410.25 unconstitutional insofar as those sections purport to authorize the submission and acceptance of a "new charter" or "revised" home rule charter in any other manner than as prescribed by Minn. Const. art. 4, § 36, which authorizes the adoption of home rule charters by cities and villages. It also sought a determination of whether a certain proposal by the

Minneapolis Charter Commission constituted an amendment to its present home rule charter to be submitted and accepted as such.

The amended judgment below was entered on February 9, 1948, determining that the proposal was not an amendment, but a new charter and on the authority of §§ 410.23, 410.24, and 410.25 might be submitted to the electorate in the manner that the original home rule charter was, by § 36, required to be submitted. Appeal was taken by plaintiff February 9, and by the city, the members of the city council, and the city clerk February 10. The mayor took no appeal. By agreement of counsel, briefs were filed, and the appeals were argued before this court February 24.

The background of legislation and constitutional history, prior to the adoption of Minn. Const. art. 4, § 36, shows that much legislation prior to Minn. Const. art. 4, § 33, was special with reference to various municipalities and that much time of the limited legislative session was consumed thereby. Section 33,[2] forbidding special legis-

---

[2]Minn. Const. art. 4, § 33, as amended, reads as follows:

"SEC. 33. In all cases when a general law can be made applicable, no special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined without regard to any legislative assertion on that subject. The legislature shall pass no local or special law regulating the affairs of, or incorporating, erecting or changing the lines of, any county, city, village, township, ward or school district, or creating the offices, or prescribing the powers and duties of the officers of, or fixing or relating to the compensation, salary or fees of the same, or the mode of election or appointment thereto, authorizing the laying out, opening, altering, vacating or maintaining roads, highways, streets or alleys; remitting fines, penalties or forfeitures; regulating the powers, duties and practice of justices of the peace, magistrates and constables; changing the names of persons, places, lakes or rivers; for opening and conducting of elections, or fixing or changing the places of voting; authorizing the adoption or legitimation of children; changing the law of descent or succession; conferring rights upon minors; declaring any named person of age; giving effect to informal or invalid wills or deeds, or affecting the estates of minors or persons under disability; locating or changing county seats; regulating the management of public schools, the building or repairing of schoolhouses, and the raising of money for such purposes; exempting property from taxation, or regulat-

lation, was proposed and adopted in 1881, and amended in 1892 to include the regulation or incorporation of cities. There followed considerable difficulty in framing general legislation to meet specific needs of municipalities. The legislature then proposed, and in 1896 the people adopted, § 36,[3] which was amended in 1898[4] and again in 1942.[5]

ing the rate of interest on money; creating corporations, or amending, renewing, extending or explaining the charters thereof; granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever, or authorizing public taxation for a private purpose. Provided, however, That the inhibitions of local or special laws in this section shall not be construed to prevent the passage of general laws on any of the subjects enumerated.

"The legislature may repeal any existing special or local law, but shall not amend, extend or modify any of the same."

[3]Minn. Const. art. 4, § 36, as amended, reads as follows:

"SEC. 36. Any city or village in this state may frame a charter for its own government as a city consistent with and subject to the laws of this state, as follows: The legislature shall provide, under such restrictions as it deems proper, for a board of fifteen freeholders, who shall be and for the past five years shall have been qualified voters thereof, to be appointed by the district judges of the judicial district in which the city or village is situated, as the legislature may determine, for a term in no event to exceed six years, which board shall, within six months after its appointment, return to the chief magistrate of said city or village a draft of said charter, signed by the members of said board, or a majority thereof. Such charter shall be submitted to the qualified voters of such city or village at the next election thereafter, and if four-sevenths of the qualified voters voting at such election shall ratify the same it shall, at the end of thirty days thereafter, become the charter of such city or village as a city, and supersede any existing charter and amendments thereof; Provided, that in cities having patrol limits now established, such charters shall require a three-fourths majority vote of the qualified voters voting at such election to change the patrol limits now established. Before any city shall incorporate under this act the legislature shall prescribe by law the general limits within which such charter shall be framed. Duplicate certificates shall be made setting forth the charter proposed and its ratification, which shall be signed by the chief magistrate of said city or village and authenticated by its corporate seal. One of said certificates shall be deposited in the office of the secretary of state, and the other, after being recorded in the office of the register of deeds

L. 1899, c. 351, amended by L. 1901, c. 323, provided for the board of 15 freeholders, authorized by § 36, to be appointed by the district judges for terms of six years, and prescribed the general limits

---

for the county in which such city or village lies, shall be deposited among the archives of such city or village, and all courts shall take judicial notice thereof. Such charter so deposited may be amended by proposal therefor made by a board of fifteen commissioners aforesaid, published for at least once each week for four successive weeks in a legal newspaper of general circulation in such city or village, and accepted by three-fifths of the qualified voters of such city or village voting at the next election and not otherwise; but such charter shall always be in harmony with and subject to the constitution and laws of the state of Minnesota. The legislature may prescribe the duties of the commission relative to submitting amendments of charter to the vote of the people, and shall provide that upon application of five per cent of the legal voters of any city or village, by written petition, such commission shall submit to the vote of the people proposed amendments to such charter set forth in said petition. The board of freeholders above provided for shall be permanent, and all the vacancies by death, disability to perform duties, resignation or removal from the corporate limits, or expiration of term of office, shall be filled by appointment in the same manner as the original board was created, and said board shall always contain its full complement of members. It shall be a feature of all such charters that there shall be provided, among other things, for a mayor or chief magistrate, and a legislative body of either one or two houses; if of two houses, at least one of them shall be elected by general vote of the electors. In submitting any such charter or amendment thereto to the qualified voters of such city or village, any alternate section or article may be presented for the choice of the voters, and may be voted on separately without prejudice to other articles or sections of the charter or any amendments thereto. The legislature may provide general laws relating to affairs of cities, the application of which may be limited to cities of over fifty thousand inhabitants, or to cities of fifty and not less than twenty thousand inhabitants, or to cities of twenty and not less than ten thousand inhabitants, or to cities of ten thousand inhabitants or less, which shall apply equally to all such cities of either class, and which shall be paramount while in force to the provisions relating to the same matter included in the local charter herein provided for. But no local charter, provision, or ordinance passed thereunder shall supersede any general law of the state defining or punishing crimes or misdemeanors."

[4]The 1898 amendment added the provision for a petition by five percent of the voters.

within which the charter to be drafted by them should be framed. L. 1909, c. 236, enacted provisions which purported to authorize cities having home rule charters to adopt a "new charter" or "revisions" of their home rule charters in the same manner and mode as the law required for the proposal and acceptance of the original home rule charter. The provisions of c. 236 now appear as M. S. A. 410.23, 410.24, 410.25.[6]

Minneapolis brought itself within the purview of § 36 in 1920 by having a charter commission appointed under authority of that section and legislation in furtherance thereof and by adopting the home rule charter proposed by the commission. The present litigation arises out of the fact that the charter commission has proposed what it calls a "new charter," which is regarded by plaintiff as an amendment of the present charter. The trial court decided, and counsel for the commission contend, that the proposal is in fact a new charter and not an amendment and that it may be submitted and accepted under M. S. A. 410.23, 410.24, 410.25, which plaintiff challenges as unconstitutional.

The question presented for decision is whether §§ 410.23, 410.24, and 410.25 violate Minn. Const. art. § 36, insofar as they purport to authorize the charter commission to submit a proposal as a new

———

[5]The 1942 amendment added the provision for publication once each week for four weeks in a legal newspaper instead of for 30 days in three papers.

[6]"410.23 Any city in this state which now has, or may hereafter adopt, a so-called 'home rule' charter by and under the provisions of the Constitution of the State of Minnesota, Article 4, Section 36, and of any statutes enacted in pursuance thereof, is hereby authorized and empowered to frame, submit, and adopt a new charter in the same manner and mode, as is by law provided for the original adoption of such so-called 'home rule' charter.

"410.24 Any city named in section 410.23 is hereby authorized and empowered to amend its present so-called 'home rule' charter in the nature of a revision and submit and adopt such revision as is by law provided for the original adoption of such so-called 'home rule' charter.

"410.25 It shall not be necessary or obligatory for the board of freeholders framing such new charter, or making such revision under sections 410.23 and 410.24, to return the same to the chief magistrate of such city within six months."

charter in the same way as the original home rule charter was submitted and accepted, instead of as amendments are required by § 36 to be submitted and accepted.

By § 36, the people of the state carved out of the power of the legislature and vested in the electorate of the municipalities to which it applied the power to make charters for self-government, within certain limitations. In Almquist v. City of Biwabik, 224 Minn. 503, 507, 28 N. W. (2d) 744, 746, this court said:

"* * * Home rule charters are but a constitutional diversion of legislative power from the constitutional legislature to the citizens of the charter-making area, * * *. The whole plan of home rule charters as set up by the adoption of § 36 is an exception carved out of the powers which, under the constitutional division of powers, was conferred exclusively upon the legislature as an independent branch of the government."

Section 36 set up a symmetrical plan, complete in itself, clearly defining the powers of the commission and those left to the legislature. By making the board of freeholders permanent and investing it with power to propose a charter and amendments thereto, it adequately provided for not only the original charter, but for any modifications which the people might desire. The obvious purpose was to take from the legislature and vest in the electorate of the city a government with a measure of stability which could be changed only by well-publicized and well-considered amendments. This is evident from the requirement of a greater percentage of votes to accept amendments than for adoption of an original charter and by the publicity required for proposed amendments. It definitely prescribed just what powers and duties the board should have, and it definitely described and delimited the powers that were left in the legislature. Section 36 was not self-executing in one sense, because it was not available to municipalities until the legislature prescribed the general limits within which the charter "shall be framed." It left four things to be done by the legislature: (1) To provide for a board of 15 freeholders, to be appointed by the district judges, and to fix their terms at not to exceed six years (this was a

command; the length of term of office of the members of the board was the only thing left to the wisdom of the legislature) ; (2) to prescribe the general limits within which a charter should be framed (this also was a command, but left the limits of power to the wisdom of the legislature) ; (3) to prescribe the duties of the commission (the board of freeholders) relative to submitting *amendments* of the charter; (4) in making general laws relating to municipal affairs, to classify the cities of the state according to population. There is no contention by anyone that this last power was exercised in §§ 410.23, 410.24, and 410.25. These provisions circumscribe the powers relating to home rule charters which were left in the legislature by the people when they adopted § 36. If §§ 410.23, 410.24, and 410.25 are valid, authority for their enactment must be found within these limitations of power. The legislature must abide within those limits and may not otherwise deal with the subject matter of § 36 than as so authorized. We look in vain for any such authority. It cannot be spelled out of any one of the clauses in § 36. The first two relate solely to matters prior to the adoption of the original home rule charter. The third relates to the duties of the board to propose amendments, not to the power or manner of submission; nor can the legislature enlarge the powers of the commission in contradiction to or elaboration of the specific powers invested in it and delimited by the constitution. It may not violate the symmetry of the complete and comprehensive plan set up by § 36.

On the question here presented, it is significant that § 36 constitutes the board of freeholders a permanent board, and therefore, in contemplation of law, there is continuity of duties, powers, and responsibilities in that board. Consequently, the present board of 15 commissioners is as much the same board as the one which formulated the first home rule charter in 1920, just as this court is the same court as that established originally by the Minnesota constitution. The powers vested by § 36 in the board are to draft a charter for submission to the voters of the city and to return that draft to the chief magistrate of the city within six months from the appointment of the board. Section 36 specifically states that

the proportion of qualified voters necessary to accept the original proposed charter shall be four-sevenths of those voting at the election. It makes no requirement as to publication as it did in regard to amendments. Once accepted, the charter becomes *the city charter,* and it supersedes "any existing charter and amendments thereof." Counsel for the commission ingeniously endeavor to support the validity of §§ 410.23, 410.24, and 410.25 by asserting that, because § 36 uses the phrase quoted it implies that the original home rule charter may be superseded by a new charter, proposed by the commission, submitted and accepted in the same manner as the original home rule charter was submitted and accepted. They ignore the fact that in common parlance and in the commonly accepted language of the profession the special or general laws prescribing the government of a city are commonly referred to as its "charter." Obviously, the quoted language was so used in § 36, because it was used only in connection with the effect of the adoption of the original home rule charter, which could only supersede such legislation. The original charter so adopted became the established charter, subject to amendment or complete revision, as might be proposed by amendment. So long as § 36 remains in force, the charter, as originally adopted and subsequently amended, is the charter of the city. The process of adoption does not start over, nor can the legislature start it over.

Referring to the original home rule charter, which is the charter previously referred to, § 36 states:

"* * * Such charter so deposited may be amended by proposal therefor made by a board of fifteen commissioners aforesaid, published for at least once each week for four successive weeks in a legal newspaper of general circulation in such city or village, and accepted by three-fifths of the qualified voters of such city or village voting at the next election *and not otherwise;* * * *." (Italics supplied.)

The phrase "and not otherwise" emphasizes the intent, otherwise quite clear, to foreclose and prohibit any other method of modifying the home rule charter. It must be by amendment only. The commission is endowed with no other power or authority to modify or

change "the charter," nor does § 36 permit the legislature so to endow it. The provisions for formulating and submitting the original charter and, after its adoption, for formulating and submitting amendments constitute the total extent of power of proposal vested in the board by the constitution. Whether the proposed change in the charter be complete or only slight, the method prescribed by § 36 is the only one permitted. After a municipality has adopted a charter, § 36 expressly, and therefore exclusively, provides how it may be modified, that is, by amendment. "Where constitutions speak, statutes should be silent." Switzer v. State ex rel. Silvey, 103 Ohio St. 306, 312, 133 N. E. 552, 554. In its opinion, that court also said, speaking of the home rule charter provision in the Ohio constitution, which in this respect is similar to § 36 (103 Ohio St. 314, 133 N. E. 554) :

"These provisions are not only mandatory, but they are also exclusive, that is, they are controlling as against any statutory enactment or departure therefrom.

"Now, after a municipality has adopted a charter, the state constitution itself expressly and therefore exclusively provides for a change in such municipal constitution or charter, that is by amendment, * * *."

Nor does the provision in § 36 which authorizes the legislature to prescribe the *duties* of the commission relative to submitting *amendments* of the charter to the vote of the people permit it to circumvent the strict and definite requirement for amendment of the original charter by incorporating the amendment with some provisions already in the existing charter and by submitting such amendments in the guise of an original or new charter and therefore evading the requirements for publication or that it be accepted by a three-fifths vote. That authority relates strictly to amendments, not to new charters, and relates only to *duties* to submit, not to manner of submission or acceptance. That construction is clear. The provision was in § 36 when first adopted, and it was immediately supplemented by the requirement adopted in 1898 for the submission of an amendment petitioned for by five percent of the voters.

In our opinion, the language of § 36 is clear and cannot be evaded by first endeavoring to create either an ambiguity or an unwarranted implication from the language actually used and thus speciously spell out a power in the legislature which § 36 did not contemplate; nor can the legislature by statute enlarge the powers of the commission as circumscribed and limited by the constitution.

Counsel for the commission rely principally upon Morrow v. Kansas City, 186 Mo. 675, 85 S. W. 572. However, the Missouri situation is to be distinguished from the situation before us. In that state, the charter commission was not established as a permanent institution by their constitution, but was authorized to be created by the city council. The commission exhausted its powers with the original home rule charter. Amendments were to be proposed by the city legislative body. Under our § 36, there is but one permanent board, which has the sole power to propose amendments, although it must do so on petition of five percent of the voters. If our constitution provided for a temporary board with no power to propose amendments, it might be argued with more force that the legislative body which created it could create another board when it became necessary to revise the charter. There is no such necessity here, where the board is permanent and has plenary powers to propose amendments even to the power of complete revision. The Missouri constitution left a loophole for the argument that the city council was at liberty to create a new board which might propose a new charter. The court accepted that argument without giving any consideration to the phrase "and not otherwise." The same can be said of the constitutional provision under consideration in Reeves v. Anderson, 13 Wash. 17, 42 P. 625. Other cases under dissimilar constitutions cited by counsel for the commission have been examined, but we do not regard them as being in point.

Blanchard v. Hartwell, 131 Cal. 263, 63 P. 349, cited by plaintiff and the city, concerns the city of Los Angeles, which had a home rule charter adopted pursuant to the California constitution, which, however, did not provide for a permanent charter commission, nor did the California constitution contain the prohibitory words "and

not otherwise" found in § 36 relative to amendments. Nevertheless, the California court held that the provisions of that state's constitution, as it was at that time, were mandatory, prohibitory, and exclusive as to mode, and held that there was but one way of modifying the charter, and that by amendment. All others were prohibited. It also commented that any other construction of the constitutional provision in regard to amendment would permit it to be circumvented by incorporating an amendment in an otherwise complete restatement of the existing charter. The California court clearly distinguished the Reeves case and used the following language with regard to such a situation (131 Cal. 265, 63 P. 350):

"Since a procedure for the amendment of such a charter is expressly provided, the presumption would be (independently of the declaration that all the provisions of the constitution are mandatory and prohibitory unless the contrary is expressly stated) that such mode is exclusive. Under such a constitution this seems indisputable. The one mode of amendment is commanded, and all others are prohibited.

"* * * In the third place, the amendment must be approved by a majority of three-fifths of the qualified electors; a charter may be adopted by a majority vote of such electors. This is also a provision favoring permanence, and against changes made under temporary excitement. What a fatuous limitation or requirement this would be if the policy thus clearly indicated could be defeated by adopting a new charter once in sixty days by a mere majority vote."

■ There is no merit to the contention that this court has given its tacit approval to §§ 410.23, 410.24, and 410.25 in the two Duluth cases cited[7] by the commission. The question of constitutionality was not raised in either case; nor can practical construction by the legislature, the attorney general, or various municipalities be invoked against the clear language of the constitution. State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 271, *et seq.*, 220 N. W. 951, 956. In that case, there was infinitely greater temptation

[7]Standard Salt & Cement Co. v. National Surety Co. 134 Minn. 121, 158 N. W. 802; Woodbridge v. City of Duluth, 121 Minn. 99, 140 N. W. 182.

to resort to practical construction of the constitution by the repeated acts of the legislature and public officials extending over a period of 70 years, but this court said (175 Minn. 270, 272, 220 N. W. 956):

"The principle of our decision of this case, as well as of those we have just cited, is that which attends every constitutional grant of power to any official or department of government. 'A constitution being the paramount law of a state, designed to separate the powers of government and to define their extent and limit their exercise by the several departments, * * * no other instrument is of equal significance. * * * when the people have declared by it that certain powers shall be possessed and duties performed by a particular officer or department, their exercise and discharge by any other officer or department, are forbidden by a necessary and unavoidable implication. Every positive delegation of power to one officer or department implies a negation of its exercise by any other officer, department or person. If it did not, the whole constitutional fabric might be undermined and destroyed.' State ex rel. Crawford v. Hastings, 10 Wis. 468, 475.

"The argument of practical construction, opposed to this decision, has so much factual basis that it deserves special attention. * * *

* * * * *

"There is thus abundant ammunition for the argument of practical construction. But the case furnishes it no target. We cannot even adopt it as a buttress for a conclusion already reached, as is sometimes done. State ex rel. Hilton v. Sword, 157 Minn. 263, 265, 196 N. W. 467. A practical construction of anything written—constitution, statute, or contract—is but an aid to interpretation, not to be resorted to unless such an aid is required. * * * All the circumstances must be considered which go to make clear the sense of the words.' 5 Wigmore, Ev. (2 ed.) § 2470(3). But when that sense is made or becomes plain, the process of interpretation ends. In construing a constitutional provision or any writing, first resort is to letter and spirit. That implies application of writing to subject matter. If without going farther the meaning is plain, interpreta-

tion is at an end. Resort cannot then be had to the extraneous to obscure what is already clear, and so start again the process of construction and excuse resort to further extraneous aids. The extraneous or subsequent cannot be resorted to as a means of refuting what is inescapable from the instrument itself in application to its subject. *It is not then permissible to adopt any different practical construction of a constitution, however long continued or well established, or however distinguished its authorship.* Hence, every authoritative statement of the doctrine of practical construction makes it applicable only in a case of doubtful meaning. See for example, Springer v. Philippine Islands, 277 U. S. 189, 48 S. Ct. 480, 72 L. ed. 845. The doctrine is allowed its 'full legitimate force * * * to solve in its own favor the doubts which arise on reading the instrument to be construed.' 1 Cooley, Const. Lim. (8 ed.) 151. It may illustrate or confirm, explain doubt or expound obscurity, but 'it can never abrogate the text, it can never fritter away its obvious sense, it can never narrow down its true limitations, it can never enlarge its natural boundaries.' 1 Story, Const. (5 ed.) § 407.

"'* * * *Were the courts, simply because of its extended duration, obliged to follow an erroneous practical construction of a plain provision of it, a constitution could be amended without consulting the people. Nothing is farther from the basic theory of our government.* 'When the meaning and scope of a constitutional provision are clear, it cannot be overthrown by legislative action, although several times repeated and never before challenged.' The delay in presenting the question is no excuse for not giving it full consideration and determining it in accordance with the true meaning of the constitution. Fairbank v. U. S. 181 U. S. 283, 311, 21 S. Ct. 648, 45 L. ed. 862." (Italics supplied.)

Moreover, " 'The application of the doctrine of contemporaneous construction is more restricted as applied to the interpretation of constitutional provisions than when applied to statutory provisions. * * * So, where the meaning of a constitutional provision is clear, a contemporaneous or practical legislative or executive interpretation thereof is entitled to no weight, and will not be al-

lowed to distort or in any way change its natural meaning.' " Button v. Drake, 302 Ky. 517, 521, 195 S. W. (2d) 66, 68, 167 A. L. R. 1046.

See, also, 16 C. J. S., Constitutional Law, § 32, p. 71; 11 Am. Jur., Constitutional Law, § 78, p. 698. Other cases substantiating this limitation include Fairbank v. United States, 181 U. S. 283, 311, 21 S. Ct. 648, 659, 45 L. ed. 862, 874; State ex rel. Allis v. Wiesner, 187 Wis. 384, 398, 204 N. W. 589, 595; Neiberger v. McCullough, 253 Ill. 312, 323, 97 N. E. 660, 664.

■ We need not discuss at any length the problem of whether the proposal under consideration here is in the form of a new charter, a revision, or an amendment. The court below found that "very many subsections and subdivisions are substantially identical with similar provisions in the existing Home Rule Charter." In our view, the commission may, if in its wisdom it so desires, propose an amendment which is a complete revision or modification of the existing home rule charter so long as it respects the limitations contained in § 36 and keeps within the prescribed general framework. Reutener v. City of Cleveland, 107 Ohio St. 117, 141 N. E. 27; State ex rel. Duniway v. City of Portland, 65 Or. 273, 133 P. 62.

It is our opinion, and we so declare, that §§ 410.23, 410.24, and 410.25 are unconstitutional insofar as they attempt to authorize the submission of a new charter or a revision otherwise than as an amendment and in the manner that § 36 requires an amendment to be submitted and accepted. In short, the proposal under consideration must be published and accepted as provided for amendments.

Judgment reversed.

MAGNEY, JUSTICE (dissenting).

The merits or demerits of the proposed charter or any part thereof are, of course, none of our concern. Our province is limited to the legal questions raised in connection with its submission.

The first question called to our attention is whether the document proposed by the charter commission is a new charter or an amendment. Plaintiff, the taxpayer, contends that it is an amend-

ment to the present charter. Defendants, members of the charter commission, members of the city council, and the city clerk, insist that it is a new charter. The trial court held it to be a new charter. The clear intention of the charter commission is that it is a new charter. As observed by the trial court, there is nothing to indicate that the proposed charter is a mere subterfuge in form of an amendment while pretending to be a new charter. It is suggested by counsel that the provisions of the new proposed charter that are similar in wording or substance with the provisions of the present charter be counted, and then that the changed or dissimilar provisions in the two documents be also counted. That may be a way of determining the question, but as the provisions of a charter are of different importance, and the dissimilar provisions, although fewer, may be of vital importance, it seems that a purely mathematical calculation and determination therefrom is unsound. From the very nature of things, there are bound to be many provisions in a present city charter and a proposed charter that are similar in substance if not in language.

In the instant case, the trial court has passed on this disputed question and found that the document drawn by the charter commission is a proposed new charter, and not an amendment to the present one. In my opinion that finding is correct.

The question then arises: If this document is a proposed new charter and not a proposed amendment to the present charter, is there legal authority for its submission? Appellants claim that no such legal authority exists. Respondents, the members of the charter commission, contend that the proposed submission is authorized, and therefore legal.

By an amendment to Minn. Const. art. 4, § 33, adopted in 1892, special legislation as to cities and villages was wholly prohibited. This created difficulties, unnecessary here to enumerate, in the administration of municipal public affairs, as no amendments or additions could be made to the charters under which the municipalities were operating, and special new charters could not be granted. To relieve the situation, it was thought wise to authorize municipal-

ities to frame and adopt their own charters. The adoption in 1898 of § 36 of art. 4 of the constitution, the so-called "Municipal Home Rule Provision," followed, to provide the remedy. This amendment reads in part as follows:

*"Any city* or village \* \* \* *may frame a charter* for its own government as a city consistent with and subject to the laws of this state, as follows: [stating procedure]. Such charter \* \* \* [if ratified] shall \* \* \* become the charter of such city or village as a city, and supersede *any existing charter and amendments thereof,* \* \* \*.

"Before any city shall incorporate under this act *the legislature shall prescribe by law the general limits within which such charter shall be framed.* \* \* \*

"The legislature may provide general laws relating to affairs of cities, \* \* \* which shall be paramount while in force to the provisions relating to the same matter included in the local charter herein provided for." (Italics supplied.)

In 1909 the legislature adopted c. 236 (L. 1909). Section 1 of such act (now M. S. A. 410.23) reads:

"Any city in this state which now has, or may hereafter adopt, a so-called 'home rule' charter by and under the provisions of section 36, article 4 of the constitution, and of any statutes enacted in pursuance thereof, is hereby authorized and empowered to frame, submit and adopt a new charter in the same manner and mode as is by law provided for the original adoption of such so-called 'home rule' charter."

Under this statute, the city of Minneapolis is "authorized and empowered to frame, submit and adopt a new charter," unless § 410.23 is invalid as being in contravention of Minn. Const. art. 4, § 36. Inquiry must therefore be made to determine whether § 410.23 contravenes and is consequently unconstitutional. If § 410.23 is constitutional, then it follows, of course, that the proposed new charter may be submitted; and if adopted it becomes the charter of the city. Nowhere in art. 4, § 36, does it state that

there can be but one "home rule" charter adopted by a city; and nowhere is there any provision prohibiting the legislature from authorizing cities already operating under a home rule charter from adopting a new one.

In State ex rel. Simpson v. City of Mankato, 117 Minn. 458, 136 N. W. 264, 41 L. R. A. (N. S.) 111, the question was raised as to the constitutionality of a charter providing for a commission form of government. The legislature had passed an act permitting cities to adopt a commission form of government, two of the features of such charter being that (1) the mayor is a member of the legislative body; and (2) the commissioners are both legislators and administrators, while art. 4, § 36, provides that "It shall be a feature of all such charters that there shall be provided * * * for a mayor or chief magistrate, and a legislative body of either one or two houses." The claim was made that a charter which gives to such body (legislative) both executive and legislative powers and includes in its membership the chief executive of the city is not in accordance with the provisions of the amendment. The court said (117 Minn. 463, 136 N. W. 265):

"The relator has cited many authorities to support the proposition, propounded by Chief Justice Start in Cooke v. Iverson, 108 Minn. 388, 397, 122 N. W. 251, 254 [52 L. R. A. (N. S.) 415], that, 'when the language of the Constitution is positive and free from all ambiguity, courts are not at liberty, by a resort to the refinements of legal learning, to restrict its obvious meaning.' That this is the true canon of construction in applying constitutional provisions, cannot be doubted. We again declare, as was declared by the Chief Justice in Cooke v. Iverson, supra, that 'we must accept the Constitution as it reads when its language is unambiguous, for it is the mandate of the sovereign power.' But from this canon of constitutional construction we cannot slip so readily into the position into which the relator, seemingly unmindful of another great canon of the law, has slipped, and declare that, because of the constitutional requirement that the so-called home rule charters must provide for a 'mayor or chief magistrate and a legislative body,' the

legislature, whose will, except as restricted by the Constitution, is equally the will of the people, may not authorize the freeholders of a city to invest their mayor or chief magistrate with power to participate in the deliberations of the local legislative body, and to give the latter the power to participate in the administrative functions of the city.

"We must not forget that the voice of the legislature is the voice of the sovereign people, and that, subject only to such limitations as the people have seen fit to incorporate in their Constitution, the legislature is vested with the sovereign power of the people themselves. In other words, the provisions of a state Constitution do not and cannot confer upon the legislature any powers whatever, but are mere limitations in the strict sense of that term, and the legislature has all the powers of an absolute sovereign of which it has not been divested by the Constitution. [Citing cases.] In determining, therefore, the constitutionality of an act of the legislature, the canon of constitutional construction above recited must be applied, together with that other equally as sacred canon that every intendment must be indulged in favor of the constitutionality of an act of the legislature. State v. Corbett, supra; 3 Dunnell, Minn. Digest, § 8931."

In State v. Corbett, 57 Minn. 345, 350, 59 N. W. 317, 318, 24 L. R. A. 498, Mr. Justice Mitchell, speaking for the court, said:

"Except where the constitution has imposed limitations upon the legislative power, it must be considered as practically absolute; and to warrant the judiciary in declaring a statute invalid they must be able to point out some constitutional limitation which the act clearly transcends."

The first and main question, then, for determination is not whether the constitution authorized the law of 1909, but whether such act contravenes any provision thereof.

In Farrell v. Hicken, 125 Minn. 407, 412, 147 N. W. 815, 817, L. R. A. 1915B, 401, this court stated:

"* * * But we must bear in mind that, as far as power of legislation is concerned, the state Constitution is an instrument of limitation, not of grant. We need not search in it for authority for this legislation. We need look in it only for prohibitions. No constitutional authority to legislate upon this subject is required. The power of the legislative authority to legislate is plenary, unless the Constitution has deprived it of that power."

See, Lommen v. Minneapolis Gaslight Co. 65 Minn. 196, 207, 68 N. W. 53, 54, 33 L. R. A. 437, 60 A. S. R. 450; State ex rel. Simpson v. City of Mankato, 117 Minn. 458, 136 N. W. 264, 41 L.R.A.(N.S.) 111, *supra*.

In State ex rel. Meighen v. Weatherill, 125 Minn. 336, 339, 147 N. W. 105, 106, to the same effect, we stated:

"* * * for that department [legislative] is clothed with the right to exercise any and all powers of government where no restrictions are expressly or by necessary implication imposed by the Constitution. Or, as otherwise expressed, the Constitution is generally construed as a limitation and not a grant of power. State [ex rel. Simpson] v. City of Mankato, 117 Minn. 458, 136 N. W. 264, 41 L. R. A. (N. S.) 111. And where a particular act of the legislature is questioned on constitutional grounds it is not the justification therefor that must be pointed out, but the clause or provision of the Constitution which prohibits its enactment. Black, Const. Law 35."

In Williams v. Evans, 139 Minn. 32, 165 N. W. 495, L. R. A. 1918F, 542, the rule is again stated as follows:

"The state legislature possesses all legislative power not withheld or forbidden by the state or Federal Constitution."

See, also, to the same effect State ex rel. Kelly v. Wolfer, 119 Minn. 368, 377, 138 N. W. 315, 319, 42 L.R.A.(N.S.) 978, Ann. Cas. 1914A, 1248; State v. M. & O. Power Co. 121 Minn. 421, 428, 141 N. W. 839, 842; State ex rel. Smith v. City of International Falls, 132 Minn. 298, 156 N. W. 249.

There is nothing in art. 4, § 36, which by words or by necessary implication restricts the legislature in giving authority to municipalities to adopt a second charter. And, as was said in State ex rel. Meighen v. Weatherill, 125 Minn. 336, 339, 147 N. W. 105, 106, *supra,* "where a particular act of the legislature is questioned on constitutional grounds it is not the justification therefor that must be pointed out, but the clause or provision of the Constitution which prohibits its enactment." It is impossible to point out the clause or provision in art. 4, § 36, which prohibited the legislature from passing L. 1909, c. 236, nor can the prohibition be found by necessary implication.

The whole purpose of art. 4, § 36, was to give municipalities greater freedom of action. Appellants are now attempting to place upon the municipality restrictions that certainly were not intended. As was said in State ex rel. Smith v. City of St. Paul, 128 Minn. 82, 89, 150 N. W. 389, 392, *supra:*

"* * * Manifestly the purpose of article 4 was to give cities the maximum freedom of self-government consistent with the general welfare of the state * * *."

Counsel for appellant members of the city council quote from Switzer v. State ex rel. Silvey, 103 Ohio St. 306, 312, 133 N. E. 552, 554, where it is said: "Where constitutions speak, statutes should be silent." The converse must be equally true, that where constitutions are silent on matters such as here involved statutes may speak. In the instant case, the constitution is silent as to second charters. It is silent where it might have prohibited the legislature from authorizing cities operating under a home rule charter from adopting a second. Furthermore, there is no apparent valid reason why such a prohibition should have been made. Why should the city not have a continuing right?

In two jurisdictions, where no statute similar to L. 1909, c. 236, had been enacted, the supreme courts have held, under constitutional provisions very similar to that of Minnesota, that a municipality did not exhaust its authority to adopt a second charter by the adoption of a first home rule charter.

In Reeves v. Anderson, 13 Wash. 17, 19, 42 P. 625, 626, the constitutional provision reads as follows:

"* * * Such proposed charter shall be submitted to the qualified electors of said city, and if a majority of such qualified electors voting thereon ratify the same, it shall become the charter of said city and shall become the organic law thereof, and supersede any existing charter, including amendments thereto, and all special laws inconsistent with such charter. * * * Such charter may be amended by proposals therefor submitted by the legislative authority of such city to the electors thereof at any general election, after notice of such submission published as above specified, and ratified by a majority of the qualified electors voting thereon."

The court said (13 Wash. 21, 23, 42 P. 626, 627):

"We think that the right to make a new charter is included within the constitutional grant of power to 'frame a charter;' that the right is a continuing right, and that by the act in question the legislature has made it possible for the people to exercise such constitutional right to create a new charter. * * *

\* \* \* \* \*

"We think that the power to frame a charter for themselves is a continuing right vested in the voters of the city, and that it does not become exhausted because once exercised. We agree with counsel for respondent that the object of the constitutional provision is to confer upon the large cities of the state the power of local self-government (subject, as already stated, to general laws) and that this right to 'home rule is not limited at all in point of time.' "

In Morrow v. Kansas City, 186 Mo. 675, 685, 689, 85 S. W. 572, 574, 575, where the court held that the power conferred by the constitution was continuing, so that a city to which the section applied did not exhaust its constitutional grant by having once adopted a charter thereunder, it said:

"* * * the people having vested in the city and its inhabitants the power to frame and adopt a charter, we can see no reason why the exercise of it in 1889 should forever tie the hands of the city

from adopting a new charter in harmony with the conditions and necessities which its growth may require, or unforeseen exigencies may demand, for the welfare of its people.

\* \* \* \* \*

"\* \* \* It ordains that *'any* city' of more than one hundred thousand inhabitants may *frame* a charter for its own government. It does not say any *unchartered* city of that population, or a city having a general legislative charter, or one having a special legislative charter prior to the adoption of the Constitution, may frame its own charter, but *'any city'* of the requisite population, which will include one that has already framed and adopted a charter, and it is not for the courts to import into the Constitution a proviso that 'any city' of the requisite population *which has not already availed itself of this grant, may* frame and adopt its own charter.

"The grant is broad and unrestricted. But this is not all. This section provides further that a charter so framed and adopted shall *'supersede any existing* charter or amendments thereof.' Here it is seen again, that the charter so framed will supersede any existing charter, a freeholders' charter as well as any other.

"But it is urged that the Constitution simply provides for an amendment, and does not contemplate a new freeholders' charter after one has been framed and adopted. \* \* \*

"We can not bring ourselves to the view that it was intended to confine these cities to the amending plan."

The wording of the provision of the constitution of Missouri, as will be seen from the above, is very similar to art. 4, § 36, and the above reasoning applies fully to our situation. The Missouri court continues (186 Mo. 690, 85 S. W. 575):

"We think that the power conferred by section 16 of article 9 of the Constitution of Missouri upon cities having more than one hundred thousand inhabitants is a legislative power conferred directly upon such city and its people, and such being its nature, it is a continuing one, in the absence of a constitutional prohibition; that there is no such prohibition in the Constitution; that the

mere fact that such a charter may be amended in the manner prescribed in this section of itself does not amount to a prohibition to frame and adopt a new charter, but that the section has a twofold object, and points out a method for the obtaining of each without destroying the other."

These two cases clearly support respondents' position. In view of the provisions of the constitution, there can be no reason for holding that the power once exercised is exhausted and that there exists in the municipality no further power to frame and adopt a second or any other home rule charter. The same reason for adopting the initial, or original, charter applies to a new charter. New times demand new instrumentalities. The only case which may be considered contra is Blanchard v. Hartwell, 131 Cal. 263, 63 P. 349. In view of the difference in the constitutional provisions, it may not be said to be an authority contra to the cases from Washington and Missouri. The provisions of the California constitution are declared mandatory and prohibitory, "unless the contrary was expressly stated" with reference thereto. The California court adopted a strict construction, but it was confronted with a prohibitory and mandatory organic law. The Missouri court plainly points out the situation confronting the California court.

In passing upon the constitutionality of enactments, a cardinal rule is that every reasonable doubt must be resolved in favor of the constitutionality of a legislative act. It was so stated by Mr. Justice Mitchell in State ex rel. Hagestad v. Sullivan, 67 Minn. 379, 383, 69 N. W. 1094, 1095. In Lommen v. Minneapolis Gaslight Co. 65 Minn. 196, 207, 68 N. W. 53, 54, 33 L. R. A. 437, 60 A. S. R. 450, Mr. Justice Mitchell stated the rule as follows:

"Inasmuch as the legislature is a co-ordinate branch of the government, the courts do not sit to review or revise their legislative action; and hence, if they hold an act invalid, it must be because the legislature has failed to keep within its constitutional limits. * * * Except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute.

\* \* \* Neither are courts at liberty to declare an act void merely because, in their judgment, it is opposed to the spirit of the constitution. They must be able to point out the specific provision of the constitution, either expressed or clearly implied from what is expressed, which the act violates. Moreover, courts will never declare a statute invalid unless its invalidity is, in their judgment, placed beyond reasonable doubt. Cooley, Const. Lim. c. 7."

"This rule has always obtained in this state," this court commented in Farrell v. Hicken, 125 Minn. 407, 413, 147 N. W. 815, 817, L. R. A. 1915B, 401. See, also, Curryer v. Merrill, 25 Minn. 1, 4, 33 Am. R. 450; State ex rel. Benson v. Peterson, 180 Minn. 366, 230 N. W. 830; State ex rel. Olsen v. Board of Control, 85 Minn. 165, 88 N. W. 533; State v. Bridgeman & Russell Co. 117 Minn. 186, 134 N. W. 496, Ann. Cas. 1913D, 41; State ex rel. Simpson v. City of Mankato, 117 Minn. 458, 136 N. W. 264, 41 L. R. A. (N. S.) 111; State ex rel. Wilcox v. Ryder, 126 Minn. 95, 147 N. W. 953, 5 A. L. R. 1449; Reed v. Bjornson, 191 Minn. 254, 253 N. W. 102; Muller v. Theo. Hamm Brg. Co. 197 Minn. 608, 268 N. W. 204; State ex rel. Pearson v. Probate Court, 205 Minn. 545, 287 N. W. 297, affirmed 309 U. S. 270, 60 S. Ct. 523, 84 L. ed. 744, 126 A. L. R. 530; Dimke v. Finke, 209 Minn. 29, 295 N. W. 75; State v. Minnesota Federal S. & L. Assn. 218 Minn. 229, 15 N. W. (2d) 568.

Under the above test of constitutionality, it is clear that L. 1909, c. 236, is a valid enactment. If a valid enactment, the city of Minneapolis has the authority to submit a new charter to the voters. It violates neither the wording or spirit of the constitutional provision.

In Farrell v. Hicken, 125 Minn. 407, 412, 147 N. W. 815, 817, L. R. A. 1915B, 401, where an election contest arose in the first election which followed the adoption of a second home rule charter, this court said:

"\* \* \* The people of the city of Duluth, pursuant to the authority granted to them by the Constitution and laws of the state, adopted this charter for their own local government at a popular election, by a vote of at least four-sevenths of the electors voting."

When the court refers to the laws of the state, it seems reasonable to assume that it had in mind also L. 1909, c. 236, § 1. But it may be that no one, including the courts, had in mind the contention for invalidity now raised in the instant case in the three cases which came to this court after the adoption of the second home rule charter by the city of Duluth in 1912. In all the cases it was apparently assumed that the city had authority to adopt a second home rule charter. In Standard Salt & Cement Co. v. National Surety Co. 134 Minn. 121, 123, 158 N. W. 802, a case where reference was made to the second home rule charter of the city of Duluth, the court said:

"On December 2, 1912, the city ratified a new charter. * * * The charter became effective and superseded the former charter on January 2, 1913. Woodbridge v. City of Duluth, 121 Minn. 99, 140 N. W. 182."

In the three Duluth cases it must be said that the validity of the second charter was not an issue.

Since § 36, the constitutional amendment, was adopted in 1899, and since § 410.23 has been on our statute books since 1909, and since numerous second charters have been submitted, and of those submitted 17 have been adopted and operated under, it seems like a belated discovery that home rule cities have exhausted their authority to adopt a second charter and that they lack constitutional authority to do so. One Minnesota city is now operating under its third home rule charter. Charter elections are, as a rule, hotly contested; yet, until now, no one, so far as the records indicate, has contended that a city has no constitutional authority to adopt a second charter.

In view of the fact that the whole purpose of art. 4, § 36, was to give municipalities greater freedom in the handling of their own municipal affairs, it could not have been the intention of the electors in adopting the amendment to permit a municipality to adopt only one charter, and, by this adoption, exhaust its authority. Freedom to act but once is a very limited freedom. After once acting, the municipality would be shackled against the adoption of a new

charter to meet situations which arise in an age where municipal problems and functions not only are greatly increasing, but are also becoming more complicated and involved, requiring more efficient instrumentalities with which to meet them.

For the reasons above set forth, I respectfully dissent.

THOMAS GALLAGHER, JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Magney.

MATSON, JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Magney. It is elementary that a state legislature possesses well-nigh unlimited legislative power, except where limitations have been imposed by the federal or the state constitution. Our only concern here is to determine what limitations, if any, have been imposed on that plenary power of the legislature with respect to its exercise in granting to cities and villages the right to adopt home rule charters. Art. 4, § 33, prohibits special legislation, but does not limit the power to enact general laws. Any limitation upon the plenary power of the legislature to enact general laws must be found, if at all, in art. 4, § 36. Obviously, in adopting § 36 as an amendment to the constitution, the primary purpose was to provide cities and villages with a method by which they could, subject to certain restrictions, help themselves in obtaining a new charter. This primary purpose was effected by conferring on such cities and villages a narrowly limited legislative power which represented only a segment or fraction of the plenary power possessed by the legislature. The limitations or restrictions found in § 36 are upon the exercise by the cities and villages of that segment of legislative power so conferred, and not upon the exercise of the remaining fraction of plenary power which was not granted to such municipalities and which was not otherwise taken from the legislature. Pursuant to the power so retained by the legislature, general laws may be enacted whereby cities and villages are given other and additional authority for the adoption of new charters as conditions change from time to time. Although § 36 guaranteed to cities and villages a certain minimum power of

self-help, it was not intended as a strait jacket prohibiting the legislature from extending other and additional forms of relief. Controlling principles and authorities are fully set forth in the dissenting opinion of Mr. Justice Magney.